# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00715-CV

**David McDonald, Appellant**

**v.**

**Diana Dankworth, Appellee**

## FROM THE COUNTY COURT OF LAW NO. 1 OF WILLIAMSON COUNTY
## NO. 03-0372-CC1, HONORABLE SUZANNE BROOKS, JUDGE PRESIDING

## O P I N I O N

While driving, appellee Diana Dankworth rear-ended another motorist, appellant David McDonald. She conceded that her own negligence contributed to the collision, but contended that McDonald was also responsible because he made an "unexpected" or "sudden" stop in front of her. A jury found that both Dankworth and McDonald's negligence proximately caused the occurrence, allocated 50% of the responsibility to each, and found that McDonald had incurred, as a result of the occurrence, $4,549.57 in past medical expenses, $1,497.54 in lost wages, and zero damages for physical impairment and physical pain and mental anguish. The trial court rendered judgment on the verdict, awarding McDonald $3,023.55, 50% of the damages the jury had found. *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.012(a) (West Supp. 2005).

McDonald argues that (1) there is legally or factually insufficient evidence to support the jury's findings that his negligence was a proximate cause of the collision; (2) the evidence conclusively establishes that McDonald incurred $31,348.87 in medical expenses as a result of the collision, or, alternatively, that the jury's award of only $4,549.57 in past medical expenses is against the great weight and preponderance of the evidence; and (3) the jury's awards of zero damages for physical pain and mental anguish and physical impairment are against the great weight and preponderance of the evidence. We will affirm the trial court's judgment.

## DISCUSSION

We will detail the evidence concerning the collision and damages as we evaluate McDonald's sufficiency challenges.

**Standard of review**

We will sustain a legal sufficiency point if the record reveals: (a) the complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (citing Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362-63 (1960)). The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *See id.* at 827.

2

When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal effect, is no evidence. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (*citing Kindred v. Con/Chem, Inc*., 650 S.W.2d 61, 63 (Tex. 1983)). But more than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.* (*citing Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). We review the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller*, 168 S.W.3d at 807.

We emphasize that jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. *Id*. at 819. When there is conflicting evidence, it is the province of the jury to resolve such conflicts. *Id.* at 820. If conflicting inferences can be drawn from the evidence, we assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregard all other inferences. *Id*. at 821. But if the evidence allows only one inference, we may not disregard it. *See id.* As long as the evidence falls within a zone of reasonable disagreement, we may not substitute our judgment for that of the trier-of-fact. *See id.* at 822.

When reviewing a challenge to the factual sufficiency of the evidence supporting a finding, we must consider, weigh, and examine all of the evidence in the record, both supporting and against the finding, to decide whether the verdict should be set aside. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). We should set aside the verdict only if the evidence that supports the jury finding is so weak

3

as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

But we may not merely substitute our judgment for that of the jury. *Pool*, 715 S.W.2d at 635. The

jury remains the sole judge of witnesses' credibility and the weight to be given their testimony.

*Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

The starting point for our analysis of both types of evidentiary sufficiency challenges

is the charge as submitted to the jury. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (legal

sufficiency); *Jackson*, 116 S.W.3d at 762 (factual sufficiency); *Ancira Enters., Inc. v. Fischer*, 178

S.W.3d 82, 93 (Tex. App.—Austin 2005, no pet.).

**Negligence findings against McDonald**

In Question No. 1, the jury was asked, as to both Dankworth and McDonald, whether

that person's negligence,[1] if any, proximately caused[2] "the occurrence in question." Predicated on

a finding that both Dankworth and McDonald's negligence had proximately caused the "occurrence,"

---

[1] "Negligence" was defined in the charge as "failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances." "Ordinary care" was defined as "that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances."

[2] "Proximate cause" was defined as:

that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using "ordinary care" would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Question 2 asked the jury to allocate the percentage of the total (100%) negligence causing the occurrence that it found to be attributable to Dankworth versus McDonald. McDonald contends that there is legally or factually insufficient evidence to support the jury's findings that he was negligent and that Dankworth was not 100% responsible for the occurrence.

We note that under Texas law, as was reflected in the charge, "[t]he standards and tests for determining contributory negligence ordinarily are the same as those for determining negligence," and when contributory negligence is submitted, "the burden of proof is on the defendant to prove the defense by a preponderance of the evidence." *Carney v. Roberts Inv. Co.*, 837 S.W.2d 206, 208 (Tex. App.—Tyler 1992, writ denied).

As a threshold matter, the parties dispute whether the "occurrence in question" referenced in Questions 1 and 2 includes only the collision, as McDonald contends, or extends to the "occurrence" of McDonald's ultimate injuries, as Dankworth urges. This determination, in turn, would control the scope of evidence we may consider as potential support for the jury's finding that McDonald was negligent. McDonald argues that "occurrence in question" referred only to the collision, not his ultimate injuries, and that we may accordingly consider only McDonald's pre-accident conduct in our sufficiency analysis here. Dankworth responds that the charge did not define "occurrence in question," thereby enabling the jury to consider both McDonald's pre-accident conduct and any post-accident conduct that the jury found had contributed to his ultimate injuries. Each party attempts to characterize the other's argument as a waived complaint of charge error: McDonald suggests that Dankworth waived her complaint by agreeing to submit Question 1 with

5

the phrase "occurrence in question" rather than "injury,"[3] while Dankworth argues that McDonald waived his contention by failing to request a definition or instruction clarifying and limiting "occurrence in question" to the accident.

We need not resolve this threshold question because we conclude that evidence of McDonald's pre-collision negligence alone is sufficient to support the jury's finding that McDonald's negligence was a proximate cause of the collision.

Three witnesses testified concerning the circumstances leading up to the collision: McDonald, Dankworth, and Michael Mazza, the driver of the third vehicle involved in the collision. They did not dispute many of these circumstances. Shortly before 1:00 p.m. on Saturday, February 9, 2002, the three were in a line of northbound traffic on U.S. Highway 183 in Cedar Park. Mazza, driving a minivan, was in front of McDonald, who was driving a 2002 Chevrolet Silverado pickup. Dankworth, then sixteen, was behind McDonald, driving a Plymouth Sundance. The three vehicles were in the far-left northbound lane of an undivided portion of 183. The pavement was dry and visibility was clear.

Initially, the line of vehicles was stopped at a red light at the intersection of 183 and Cypress Creek.[4] There was a considerable amount of traffic, and it was estimated that there were

---

[3] At trial, each party submitted a proposed charge employing "occurrence in question" rather than "injury" in the negligence liability question.

[4] Mazza and Dankworth recalled that they were stopped at a red light. McDonald agreed that the three were stopped, but did not remember what color the light was, just that the vehicles in front of him were stopped. He explained that he was not watching the light specifically but only the traffic because "I was far enough back from the intersection it wasn't a concern."

as many as thirty other cars, or 400 feet, between Mazza's car and the intersection.[5] Mazza and Dankworth testified that the light turned green,[6] and all three witnesses agree that traffic began to move, then stopped again, at which time Dankworth rear-ended McDonald.

Beyond these facts, Mazza and McDonald's testimony differs somewhat from Dankworth's testimony regarding the events leading up to the collision. Mazza and McDonald gave essentially the same account. In front of Mazza was a vehicle towing a boat. Traffic had begun to move, then it began to stop again. The vehicle towing the boat stopped because the traffic ahead of it had come to a stop, requiring Mazza, and then McDonald, to also stop. Both testified that Mazza did not make an unsafe, sudden stop. Around the same time, the vehicle towing the boat began to move left into the oncoming southbound lane of 183.

Then, as McDonald described it, "I heard screeching tires. I looked back. I saw her vehicle coming and I got hit." McDonald maintained that he did not hear screeching tires until after he had already stopped. From Mazza's perspective, "As I came to a stop I checked my rearview mirror. I saw the truck behind me. I saw that it had come to a stop, shifted my focus back toward the traffic in front of me. I heard an impact, looked to the rearview mirror and saw the truck coming toward me again." Mazza denied hearing screeching tires.

As Dankworth described the collision:

---

[5] Mazza described the traffic flow as "frequently having to stop, kind of like an accordion or an inchworm where the traffic would start up and it would filter back towards the cars further away, and as they caught up it would back up again and cars would have to come to a stop."

[6] McDonald testified that he was watching only the traffic and not the light.

> I was at a stop light on the intersection of Cypress Creek and 183 and I stopped. And then traffic started going again, so I accelerated, I'm not sure how much. And then all of the sudden I heard screeching of the brakes. I looked up and I saw brake lights so I slammed on my brakes. And then I hit Mr. McDonald because I didn't stop.

Dankworth added that while she had seen McDonald pushing on his brakes, she had not noticed him pumping his brakes.

As suggested by her statement that she "looked up" before seeing McDonald's brake lights, Dankworth admitted that after the traffic signal turned green and she accelerated forward, she had not been watching the back of McDonald's truck, but instead was "looking around me seeing what was going on . . . with the other vehicles" in other lanes. Dankworth added that she had looked away for several seconds while accelerating forward and that, while doing so, she had no idea whether anything was going on in front of her. However, Dankworth later qualified these assertions by claiming that, even while looking away, she could still see McDonald's truck "in the corner of my eye."

As previously noted, Dankworth acknowledged her own responsibility in causing the accident[7] and that "[b]esides making an unexpected stop, [McDonald] didn't do anything wrong." She denied that McDonald had been driving erratically or otherwise acting unreasonably before the accident, but was resolute that he bore partial responsibility for making an "unexpected" or "sudden" stop in front of her. When specifically asked to explain what was "sudden" or "unexpected" about

---

[7] At one juncture in her testimony, she also admitted that she had been following too closely and had failed to control her speed, but later retreated, claiming "I think I was [driving carefully], though."

8

McDonald's stopping, Dankworth responded, "He just stopped unexpectedly. I didn't—I wasn't prepared for him to stop like that."

Dankworth also acknowledged that she could not see around McDonald's truck because her car was "really short compared to a truck," and thus knew nothing about events transpiring in front of McDonald. She denied knowing whether Mazza did anything unreasonable to cause the accident or was able to stop without hitting persons in front of him, as "I'm not them."

When asked to give her opinion as to why she hit McDonald, Dankworth suggested, "Just someone, either him or someone in front of him made an unexpected stop and I didn't have enough time to react because I didn't have the information that they had in front of them." When asked whether she was admitting responsibility for the accident, Dankworth responded, "I'm admitting that yes, I am responsible, but he made an unexpected stop and I didn't have any evidence of what was going on in front of him." When asked whether she was the cause of the accident, Dankworth responded, "Like I said, if they would not have stopped unexpectedly, because I didn't have the information like they had."

McDonald contends that this evidence is legally and factually insufficient to support the jury's finding that his contributory negligence was a proximate cause of the collision. He urges that, in effect, the evidence conclusively establishes that Dankworth was the sole proximate cause of the collision: that "[a]t best, Dankworth was not paying attention to her driving and failed to keep a proper lookout and control her speed." *See City of Keller*, 168 S.W.3d at 814-17 (identifying conclusive contrary evidence as one class of "no evidence" situations). McDonald also asserts that there is no evidence that he was negligent—that "[n]o one testified that McDonald was doing

9

anything wrong or driving negligently." *See Carney*, 837 S.W.2d at 210.[8] While admitting that she was negligent and that she helped cause the collision, Dankworth maintains that the following is sufficient evidence that McDonald's negligence also proximately caused the accident: (1) the undisputed fact that McDonald stopped in front of Dankworth; (2) evidence that the traffic signal was green at the time McDonald stopped; (3) Dankworth's description of McDonald's stopping as sudden or unexpected; and (4) Dankworth's testimony that she had not seen McDonald pump his brakes, which she characterizes as a signal to stop. Dankworth cites a number of cases involving rear-end collisions in which Texas courts have held that a lead driver's sudden or abrupt stop without warning on a roadway was, under the circumstances, sufficient evidence of negligence.[9]

---

[8] McDonald equates this case with *Carney v. Roberts Inv. Co.*, 837 S.W.2d 206 (Tex. App.—Tyler 1992, writ denied). *Carney* involved a rear-end collision in which a tractor-trailer owned by Roberts overtook a farm tractor being driven by Carney on a four-lane highway, killing Carney. *Id*. at 207-08. The Roberts driver admitted that his own negligence contributed to the accident, but the jury found that the negligence of both the Roberts driver and Carney proximately caused the collision, and allocated 45% of the responsibility to Carney. *Id*. at 207. The court of appeals reversed and remanded for new trial. *Id*. It found the evidence legally sufficient to support the negligence finding, relying on proof that: (1) there was a shoulder where Carney could have instead driven, (2) Carney could have noticed the truck approaching if he had been keeping a lookout to the rear, (3) Carney could have moved to the shoulder if he had seen the approaching truck and avoided the accident, and (4) Carney took no such evasive action. *Id.* at 209. The court held, however, that Roberts failed to meet its burden to establish with factually sufficient evidence that Carney actually had time to react, could have moved his tractor out of the way if he had seen the truck, or was in fact not keeping a lookout to the rear. *Id.* at 210.

The court went on to address the jury's proportionate fault finding, finding the evidence factually insufficient to support it. *Id*. In this context, the court observed that "[n]o one testified that Carney was doing anything wrong or driving negligently," and alluded to the principle, discussed below, that the duty to keep a proper lookout ordinarily does not otherwise require vigilance to the rear." *Id.*

[9] *Oakley v. C. E. Duke's Wrecker Service,* 557 S.W.2d 810, 813 (Tex. Civ. App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.) ("[t]he fact that the plaintiff made a sudden stop in front of the defendant's vehicle does not necessarily establish negligent conduct on her part, but it does

The evidence is inconsistent on whether McDonald stopped suddenly in front of Dankworth. Both McDonald and Mazza testified that McDonald had been sitting stopped in traffic behind Mazza in the moments before Dankworth hit him. The sole evidence that McDonald stopped suddenly in front of Dankworth was her testimony. She testified that McDonald stopped "unexpectedly" or "suddenly," but did little to elaborate on what she meant. Dankworth did testify, however, that she heard "screeching brakes," then saw McDonald's brake lights, but was unable to avoid hitting him. The jury could have inferred from this testimony that the screeching brakes Dankworth heard were McDonald's and that McDonald, in fact, did stop suddenly or abruptly in front of her. *See Oakley v. C.E. Duke's Wrecker Service*, 557 S.W.2d 810, 812 (Tex. Civ. App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.); *Rash v. Whisennand*, 453 S.W.2d 353, 356-57 (Tex. Civ. App.—Houston [14th Dist.] 1970, writ ref'd n.r.e.) (while a relative term, description of stop as "sudden" sufficed as a shorthand rendition of the facts and party was not required to show proof of skid marks or details regarding speed and following distance).[10] And, viewing the evidence

_____

constitute some evidence from which negligence can be inferred."); *Lumpkins v. Thompson*, 553 S.W.2d 949, 952-53 (Tex. Civ. App.—Amarillo 1977, writ ref'd n.r.e.) (lead driver owed duty of ordinary care to following driver, and issue of breach was properly submitted to the jury);*Rash v. Whisennand*, 453 S.W.2d 353, 356-59 (Tex. Civ. App.—Houston [14th Dist.] 1970, writ ref'd n.r.e.) (testimony that defendant made "sudden," "abrupt" stop "was sufficient to raise and support the jury's findings of contributory negligence and proximate cause."); *Riles v. Reaichardt*, 366 S.W.2d 655, 658 (Tex. Civ. App.—Houston 1963, no writ); *but see Barree v. City of Fort Worth*, 685 S.W.2d 475, 478 (Tex. App.—Fort Worth 1985, writ ref'd n.r.e.) (holding that there was no evidence that plaintiff lead driver had stopped suddenly; defendant admitted that plaintiff had slowed gradually).

[10] Also, as we explain below, the evidence was legally sufficient to support the jury's inference that Dankworth could see the back of McDonald's truck even while "looking around," and that she was thus capable of identifying the manner in which she saw McDonald stop. *See City of Keller v. Wilson*, 168 S.W.3d 802, 821 (Tex. 2005).

in the light favorable to the verdict, we must assume that the jury resolved this conflicting evidence in favor of concluding that McDonald stopped suddenly in front of Dankworth. "It is the province of the jury to resolve conflicts in the evidence. Accordingly, courts reviewing all the evidence in a light favorable to the verdict must assume that jurors resolved all conflicts in accordance with that verdict." *City of Keller*, 168 S.W.3d at 819.

The evidence does not conclusively establish that Dankworth was negligently failing to keep a lookout in front of her and that this failure was the sole proximate cause of the collision. Dankworth did admit that while accelerating forward, she had been "looking around . . . seeing what was going on . . . with the other vehicles," and had no idea whether anything was going on in front of her, before she "heard screeching of the brakes . . . looked up and . . . saw brake lights." Yet Dankworth also testified that even while "looking around," she could still see the back of McDonald's truck "in the corner of my eye." Absent conclusive evidence that Dankworth could not see the back of McDonald's truck in this manner, it was within the jury's province to credit Dankworth's testimony that she could. *Id.* at 812, 819-20. And a reasonable jury could have resolved any inconsistency between this statement and her other testimony in favor of concluding that Dankworth could see McDonald's truck. *Id.* at 820-21. Under our standard of review, we must assume the jury did. *Id.* at 820-21.

In light of these conclusions, McDonald's legal sufficiency challenge to the jury's contributory negligence finding turns on whether evidence that he stopped suddenly is sufficient proof that he was negligent. Dankworth contends that mere evidence that McDonald stopped suddenly in front of her is sufficient to raise an issue of his negligence. McDonald points out that

12

numerous Texas decisions hold that a motorist compelled to stop by traffic signals or traffic conditions may owe no duty to motorists approaching from the rear to keep a rear lookout or avoiding stopping suddenly.[11] He argues that the evidence is insufficient to support any inference that circumstances existed under which he had a duty not to stop suddenly, and, at most, is equally consistent with his having a duty not to stop suddenly as it is with his not having such a duty. *See City of Keller*, 168 S.W.3d at 813-14 (discussing equal inference rule). We need not consider whether evidence that McDonald stopped suddenly is alone sufficient to raise an issue regarding his negligence because other evidence is sufficient to present an issue whether McDonald had a duty under the circumstances not to stop suddenly.

In assessing the evidence bearing upon that determination, we consider not only Dankworth's description of the collision, but also the events in front of McDonald's truck that Dankworth admitted she could not see. *Id.* at 811-12 (discussing contextual evidence). Viewed in the light most favorable to the jury's finding, this evidence raises an issue as to whether McDonald was negligent in stopping suddenly under the circumstances. Specifically, both McDonald and

---

[11] As the *Oakley* court explained, "a driver may be justified in stopping his vehicle on a roadway if he acts prudently, as where under existing conditions he is compelled to stop in order to avoid conflict with traffic ahead or to comply with traffic control signals. . . . Under such circumstances, it is generally the rule that the driver is not negligent by failing to take radical, evasive action such as swerving to another lane, in order to avoid being struck from the rear by following vehicles." *Oakley*, 557 S.W.2d at 811-12 (citations omitted). But, the court also observed, "[t]here are circumstances under which a duty may exist on the part of the driver to keep a proper lookout to the rear and to give appropriate signals to the following traffic," such as "where a driver suddenly changes lanes, stops or accelerates his vehicle *without cause*, or makes some other maneuver which following vehicles have no reason to expect, a duty may exist to first determine whether the contemplated action can be effected in safety and to give a proper signal of the intended action." *Id.* at 812 (emphasis added).

13

Mazza testified that Mazza did not stop suddenly or unsafely, but made what McDonald termed a "normal stop." The jury could have credited this testimony, and doing so would have made more probable than not that either: (1) McDonald stopped more suddenly and abruptly than was necessary to avoid hitting Mazza, *cf. Rash*, 453 S.W.2d at 358-59 (finding fact issue regarding negligence where there was evidence that lead driver slammed on brakes one and one-half car lengths behind the next car in front); or (2) McDonald's sudden stop was made necessary by his negligence in following too closely behind Mazza. *Cf. Oakley*, 557 S.W.2d at 813 (evidence that lead driver had negligently created situation that required her to make sudden stop). We hold that the evidence was legally sufficient to support the jury's finding that McDonald was negligent and his negligence was a proximate cause of his collision with Dankworth.

We now turn to McDonald's factual sufficiency challenge to the jury's finding that his negligence was a proximate cause of the collision. The evidence supporting the jury's contributory negligence finding includes:

- Dankworth's testimony that McDonald stopped suddenly.

- Dankworth's testimony that she could see the back of McDonald's truck in the "corner of her eye," and thus would have been able to view the manner in which McDonald stopped.

- Dankworth's testimony that she heard "screeching brakes" immediately before the collision, which the jury reasonably could have inferred were McDonald's brakes, and which is further evidence that McDonald stopped suddenly.

- McDonald and Mazza's testimony that Mazza stopped "normally," from which the jury could have inferred that McDonald either acted negligently in stopping suddenly or negligently created the conditions necessitating that he stop suddenly.

14

The evidence supporting McDonald's account of the collision includes:

- McDonald and Mazza's testimony that both were sitting stopped in traffic before Dankworth hit McDonald.

- Dankworth's admission that she had been "looking around" while accelerating forward and had no idea what was occurring in front of her.

- McDonald's testimony that he heard squealing tires only after he was sitting stopped, when he noticed Dankworth approaching and hitting him. From this, the jury might have inferred that Dankworth slammed on her brakes and created any "squealing brakes" noise she testified she heard.

- Dankworth's testimony that she was "looking around," then heard "squealing brakes," "*looked up*," and noticed McDonald's stopped truck. This account is consistent with her not keeping a proper lookout.

- The inconsistency between this testimony and Dankworth's later qualification that she could still see the back of McDonald's truck in the "corner of my eye," from which the jury might have inferred that Dankworth was not credible.

- Dankworth's inability to articulate precisely what was "sudden" or "unexpected" about McDonald's stopping, which the jury might have inferred was consistent with her not having kept a proper lookout as she accelerated forward.

The jury's contributory negligence finding ultimately rests upon the credibility of Dankworth's testimony that she could see McDonald's truck while she accelerated forward and he stopped suddenly. We will not second-guess this credibility assessment in the guise of our factual sufficiency review. *See Jackson*, 116 S.W.3d at 761. In light of this testimony, we cannot say that the evidence is so one-sided that the jury's contributory negligence finding is clearly wrong or manifestly unjust. We hold that the evidence was both legally and factually sufficient to support the jury's finding that McDonald's contributory negligence was a proximate cause of the collision. We overrule McDonald's first issue. Our disposition of this issue is also decisive of McDonald's second

15

issue, in which he contends that the evidence is legally and factually insufficient to support any finding in Question 2 other than that Dankworth was 100% responsible for the collision. We overrule McDonald's first and second issues.

**Damages**

In his third issue, McDonald argues that the evidence conclusively establishes that he incurred $31,348.87 in past medical expenses; alternatively, he argues that the jury's award of only $4,597.57 is against the great weight and preponderance of the evidence. In his fourth and fifth issues, McDonald argues that the jury's award of zero damages for physical impairment, pain and mental anguish is against the great weight and preponderance of the evidence.[12]

The trial court submitted damages in Question 3 of the charge. It inquired, "What sum of money, if paid now in cash, would fairly and reasonably compensate David McDonald for his injuries, if any, that resulted from the occurrence in question?" The jury was asked to answer separately regarding the following elements of damages: (1) medical care in the past; (2) physical pain and mental anguish sustained in the past; (3) loss of earnings in the past; and (4) physical impairment sustained in the past. The charge did not define any of these damage elements, but did

---

[12] McDonald also purports to challenge these zero damages awards on legal sufficiency grounds. Because the amount of pain and suffering, mental anguish, and physical impairment damages are inherently subjective and uniquely within the jury's province, *see Dawson v. Briggs*, 107 S.W.3d 739, 750-51 (Tex. App.—Fort Worth 2002, no pet.), no such amount could be conclusively established in the evidence as a matter of law, and we could not render judgment awarding such an amount. *See Pilkington v. Kornell*, 822 S.W.2d 223, 225 n.1 (Tex. App.—Dallas 1991, writ denied). We accordingly will construe McDonald's issues concerning the jury's zero damages awards for pain and suffering, mental anguish, and physical impairment as solely factual sufficiency challenges; *i.e.*, that the zero damages awards are against the great weight and preponderance of the evidence.

16

instruct the jury to consider each element separately and not to include damages for one element in any other element. The jury awarded $4,597.57 for past medical care, $1,497.54 for past loss of earnings, and zero damages for both past physical impairment and physical pain and mental anguish.

McDonald introduced evidence that on the evening following the collision, he began feeling stiff and sore in his neck and upper back. He described the sensation at the time as "[n]ot a sharp pain, just soreness and stiffness and . . . a mild headache. And it seemed like I had felt some swelling in the back of my head." McDonald added that "I wasn't having a lot of pain but my movement was restricted." McDonald had planned to report to his work that evening as an Austin police officer; he began to drive to work but ultimately turned around and returned home.

McDonald went to the Seton Northwest emergency room on the following morning, and explained that he had been in an automobile accident. The staff on duty did not perform x-rays or tests, but prescribed a pain killer and muscle relaxer. On Monday morning, McDonald went to see his primary care physician, Dr. Allen Mauldin, who prescribed an anti-inflammatory drug and ordered x-rays on McDonald's cervical spine. The x-ray results were normal and indicated that McDonald had suffered no fractures. Dr. Mauldin also told McDonald not to return to work until February 14, and to confine himself to light duty for a week once he returned to work.

On the day after McDonald's visit with Dr. Maudlin, McDonald also began seeing a chiropractor whom he had found in the phone book "[b]ecause I was having problems with my upper back, shoulders and neck area . . . [s]tiffness and soreness and stiffness and—soreness." He saw the chiropractor three times a week until early March.

17

Over the next two weeks, McDonald testified that he began experiencing intermittent severe headaches in the back of his head and upper part of his neck area. He testified that he had never experienced headaches like that previously. McDonald testified that at times the pain medication and muscle relaxants he had been prescribed did not alleviate his pain, so on occasion he would drink alcohol to intensify the effects of the drugs and relieve the pain. He explained that "the pain was so severe that that's all I could do at the time."

On February 27, McDonald returned to Dr. Mauldin's office, complaining of severe headaches. Dr. Mauldin ordered an MRI to try to determine the cause of the headaches. The MRI revealed a cyst in McDonald's sinus cavity, and he was told to seek medical treatment from an ear, nose, and throat specialist (ENT). McDonald contacted the office of ENT specialists where his daughter had her tonsils removed and scheduled an appointment with the first available doctor, Dr. Steven Fyfe.

McDonald informed Dr. Fyfe that he had been referred because his MRI had revealed a cyst in his sinus cavity. Fyfe ruled out a cyst but, during his examination of McDonald, ascertained that McDonald had been in an automobile accident and had been experiencing pain in the back of his head and neck. McDonald testified that Fyfe explained that a cervical x-ray would not pick up fractures in vertebrae higher up the neck, so Fyfe ordered a CAT scan; McDonald added that this procedure was in response to his neck and head pain, not the headaches he had been experiencing. After the CAT scan was completed, McDonald appeared flush, was suffering from a severe headache, and was experiencing a tingling sensation in his jaw.

18

These symptoms concerned Dr. Fyfe, who believed they might indicate that McDonald's carotid artery had been torn in the car accident. A previous patient had suffered from the same condition after experiencing whiplash in a boating accident, and ended up having several strokes. Dr. Fyfe was so concerned that he advised McDonald to go to the emergency room immediately. In Dr. Fyfe's words, a torn artery would have been a "ticking time bomb." Fyfe ordered McDonald to the Seton emergency room, which was across the street from Fyfe's office. Once at the hospital, initial testing appeared to confirm Dr. Fyfe's suspicions. McDonald stayed at the hospital overnight and the next morning an arteriogram was performed. It revealed that, in fact, McDonald did not have a torn carotid artery.

During the evening before his arteriogram, a neurologist, Dr. Leonard, gave McDonald two steroid shots in the back of his head. Dr. Leonard administered similar treatments during subsequent visits; McDonald testified that "they were painful to get but they helped with the headaches." McDonald recounted that he started feeling better by April.

McDonald sought a total of $31,348.87 in past medical expenses, including (1) expenses from his initial emergency room visit; (2) the cost of the prescription medications he received after his initial emergency room visit; (3) expenses from his February 12 and 27 visits to Dr. Mauldin; (4) costs of the x-rays ordered by Dr. Maudlin; (5) expenses from McDonald's chiropractic treatments; (6) expenses from the MRI ordered by Dr. Mauldin; (7) expenses from McDonald's visits to Dr. Leonard; and (8) expenses associated with McDonald's visits to Dr. Fyfe and subsequent testing to rule out a torn carotid artery.

Dankworth vigorously disputed the reasonableness and necessity of the procedures ordered by Dr. Fyfe. Dr. Paul Roach, a cardiologist, testified that the symptoms Dr. Fyfe observed

in McDonald—headache, flushing of the face, and light-headedness—were "nonspecific" in nature and not necessarily symptoms of a carotid artery dissection. He also testified that a carotid artery dissection is "exceedingly rare," affecting "two or three [people] per hundred thousand or million." Dr. Fyfe's credibility was also challenged. Dankworth's counsel questioned Dr. Fyfe's ability, as an ear, nose, and throat specialist, to accurately diagnose a carotid artery dissection. He also questioned the thoroughness of Dr. Fyfe's evaluation of McDonald, specifically eliciting testimony that Dr. Fyfe did not have the records of McDonald's primary care provider in front of him while he was evaluating McDonald, and that Dr. Fyfe did not ask important questions about McDonald's history prior to making his diagnosis. Dr. Fyfe also admitted that he "didn't know exactly what was going on" with McDonald, and that is why he sent him to the emergency room. Dr. Fyfe testified that the carotid artery dissection was "just something on the list of what it might be."

It is undisputed that Dr. Fyfe, an ear, nose, and throat specialist, was selected by McDonald to treat a retention cyst in his sinus, and that this cyst was unrelated to the car accident. Dankworth also presented evidence from which the jury could have inferred that any injuries and damages that McDonald incurred were attributable to factors other than the collision. Dankworth adduced evidence that, prior to the collision, McDonald had experienced pain and discomfort in his head. McDonald admitted that he had suffered sinus problems since approximately 1997, and had periodically seen Dr. Mauldin for treatment of dizziness, which Dr. Mauldin concluded was likely a vasovagal reaction to low blood sugar or a viral infection. During the year prior to the collision, McDonald sought treatment from Dr. Mauldin for feeling light-headed and sweating. During the month prior to the collision, and as recently as ten days before it, McDonald had been seeing Dr. Maudlin for "pressure in the front of my head and some sinus and possibly allergy problems."

Dankworth also elicited evidence that McDonald had disregarded doctor's orders regarding his workload after the collision, that he had delayed seeking medical treatment, and that he wore a heavy motorcycle helmet on his job. Finally, Dankworth emphasized that McDonald had not complained of pain at the accident scene, that his x-rays were normal, and that his claimed injuries had caused relatively little interruption to his work schedule.

A rational jury could infer from the evidence that the expenses associated with Dr. Fyfe and his suspicion of a carotid artery dissection did not result from the collision, but from the discovery of the retention cyst, a condition unrelated to the collision. A rational jury could further infer that McDonald's own actions caused or contributed to his symptoms.

The evidence, therefore, fails to conclusively establish that McDonald incurred the full $31,348.87 in medical expenses that he sought. Nor is the jury's award of $4,579.57 against the great weight and preponderance of the evidence. This amount slightly exceeds the total amount of medical expenses that McDonald sought that were not attributable to Dr. Fyfe. The evidence was factually sufficient to enable the jury to award this amount. We overrule McDonald's third issue.

For similar reasons, the jury's awards of zero damages for physical impairment and physical pain and mental anguish is not against the great weight and preponderance of the evidence. McDonald attempts to invoke the principle that a jury award of no damages for physical pain or impairment must be set aside where there is objective, undisputed evidence of a significant injury. *See Jackson*, 116 S.W.3d at 775. He contends that there is undisputed evidence of such an injury here: the medical records of neurologist Dr. Leonard, which diagnose McDonald with occipital neuralgia, a chronic pain disorder caused by an injury to the occipital nerve in the back of the scalp. Assuming this condition suffices as objective proof of injury, the jury reasonably could have

attributed it to factors other than the collision. We note that Dr. Leonard did not see McDonald until roughly three weeks after the collision. The jury could have concluded that, among other things, McDonald incurred only minor injuries in the collision not rising to the level of compensable pain or impairment, and that intervening events unrelated to the collision were the true cause of the condition diagnosed by Dr. Leonard. *See Rios v. Dep't of Mental Health & Mental Retardation*, 58 S.W.3d 167, 171 (Tex. App.—San Antonio 2001, no pet.); *see also McGuffin v. Terrell*, 732 S.W.2d 425, 427-28 (Tex. App.—Fort Worth 1987, no writ) (holding that jury may award no damages for pain and suffering despite finding other damages resulting from injury, if damages found are minimal and complaint of injury is subjective). We overrule McDonald's fourth and fifth issues.

## CONCLUSION

Having overruled each of McDonald's issues on appeal, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices B. A. Smith, Puryear and Pemberton

Affirmed

Filed: May 5, 2006

22