ACCEPTED
03-15-00242-CV
8080643
THIRD COURT OF APPEALS
AUSTIN, TEXAS
12/3/2015 4:12:55 PM
JEFFREY D. KYLE
CLERK

Case Number 03-15-00242-CV

IN THE THIRD DISTRICT COURT OF APPEALS
at Austin

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
12/3/2015 4:12:55 PM
JEFFREY D. KYLE
Clerk

GUILLERMO OCHOA-CRONFEL,

Appellant,

v.

PATRICK C. MURRAY,

Appellee.

From Cause No. D-1-GN-11-002136 in the 345th Judicial District Court
Of Travis County, Texas

## APPELLANT'S REPLY BRIEF

Paul T. Morin, P.C.
State Bar No. 14460550
503 W. 14th Street
Austin, Texas 78701
Telephone: (512) 499-8200
Facsimile: (512) 499-8203
PMorin@austin.rr.com

Guillermo Ochoa-Cronfel
State Bar No. 15175600
2700 Bee Caves Road, Suite 103
Austin, Texas 78746
Telephone: (512) 347-9600
Facsimile: (512) 347-9911
Guillermo@thecronfelfirm.com

ATTORNEYS FOR APPELLANT

**December 3, 2015**

# Table of Contents

INDEX OF AUTHORITIES………………………………………..…………2

I.  Murray's Statement of Facts Mischaracterizes and/or Misstates the Record…......…………………………………………..…………………4

   1.  The Discovery Sanction…………………………………………….…4

   2.  Cronfel's Expert, Dr. Ira Lown, and Cronfel's Medical Records………...…6

   3.  Cronfel's Testimony…………………………………………......….…19

II.  Standard of Review…………………...……………………………...…23

   1.  Legal Sufficiency………………..…………………..…………23

   2.  Factual Sufficiency………………………………..…………..…..25

   3.  A Jury Can't Simply Surmise or Suspect a Vital Fact………...…………..26

III.  The Jury's Negligence Finding as to Cronfel is not Supported by Legally or Factually Sufficient Evidence…………...……………………………...27

IV.  The Evidence is not Legally or Factually Sufficient to Support the Jury's Damage Awards…………………………….……………………………31

V.  The Trial Court's Discovery Sanction was an Abuse of Discretion………....34

Conclusion….....................................................................................................35

Certificate of Compliance...............................................................................37

Certificate of Service.....................................................................................37

[1]

# INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*Browning-Ferris, Inc. v. Reyna,*
      865 S.W.2d 925 (Tex. 1993)……………………………………………..25

*Cain v. Bain*,
      709 S.W.2d 175 (Tex. 1986)……………………………………………..25

*Carney v. Roberts Inv. Co.*,
      837 S.W.2d 206 (Tex.App.-Tyler 1992, writ denied)………………………25

*City of Keller v. Wilson*,
      168 S.W.3d 802 (Tex. 2005)…………………………………23, 24, 26, 30

*Ford v. Panhandle & Santa Fe Ry. Co.*,
      252 S.W.2d 561 (Tex. 1952)……………………………………………..26

*Ford Motor Co. v. Ridgway*,
      135 S.W.3d 598 (Tex. 2004)……………………………………………..26

*Guevara v. Ferrer*,
      247 S.W.3d 662 (Tex. 2007)……………………………………………..33

*JLG Trucking, LLC v. Garza*,
      466 S.W.3d 157 (Tex. 2015)……………………………………………..33

*Joske v. Irvine*,
      91 Tex. 574, 44 S.W. 1059 (Tex. 1898)…………………………………..25

*Kindred v. Con/Chem, Inc.*,
      650 S.W.2d 61 (Tex. 1983)……………………………………………...26

*Lozano v. Lozano*,
      52 S.W.3d 141 (Tex. 2001)……………………………………………….25

[2]

*McDonald v. Dankworth*,
212 S.W.3d 336 (Tex.App.-Austin 2006, no pet.)…23, 25, 26, 27, 28, 31, 32

*Oakley v. C.E. Duke's Wrecker Service,*
557 S.W.2d 810 (Tex.Civ.App.-Houston [1st Dist.] 1977, writ ref'd
n.r.e.)…..................................................................................................27

*Plas-Tex, Inc. v. U.S. Steel Corp.*,
772 S.W.2d 442 (Tex. 1989)…………………………………………..25

*Pool v. Ford Motor Co.*,
715 S.W.2d 629 (Tex. 1986)…………………………………………..25

*Rash v. Whisennand*,
453 S.W.2d 353 (Tex.Civ.App.-Houston [14th Dist.] 1970, writ ref'd
n.r.e.)………………………………………………………….……27

## Statutes, Rules and Other Authorities

Tex. R. App. P. 38.1(g)…………………………………………………..4

Tex. R. App. P. 38.2(a)…………………………………………………..4

Tex. R. Civ. P. 215…...................................................................34, 35

Robert W. Calvert, *"No Evidence" & "Insufficient Evidence"* Points of Error,
38 Tex. L. Rev. 361, 362-363 (1960)…………………………………23

**I. Murray's Statement of Facts Mischaracterizes and/or Misstates the Record**

Under Tex. R. App. P. 38.1(g) requires that an appellant's brief, "…must state concisely and without argument the facts pertinent to the issues or points presented...The statement must be supported by record references."[1] Tex. R. App. P. 38.2(a) applies the requirements of Tex. R. App. P. 38.1(g) to the appellee's brief as well. Murray spends some 37+ pages of argument in his Statement of Facts, attacking the credibility of Appellant, Appellant's testifying expert – Dr. Ira Lown, and the medical records introduced into evidence. Murray makes a number of claims that; (i) ignore evidence from the record that is unfavorable to such claims; (ii) are not supported by his record references; and/or, (iii) are simply contradicted by the record.

1.  The Discovery Sanction.

After a brief recounting of the description of the dog attack that is the subject of the case *sub judice*, gleaned from Cronfel's First Amended Petition, Murray launches into a colorful description of the circumstances that he alleges led to the discovery sanction that Cronfel complained of in the *final* point of error in Appellant's Brief.[2] This account abandons addressing the legal points raised in Appellant's Brief related to the trial court's abuse of its discretion in assessing

---

[1] *See*, Tex. R. App. P. 38.1(g).
[2] *See*, Brief of Appellee at pp. 2-10.

[4]

sanctions against Cronfel in favor of criticizing Cronfel's efforts to protect clearly privileged, confidential medical records that had nothing to do with the underlying case. Moreover, this account relies on the sort of mischaracterizations and/or misstatements of the record that pervade Appellee's Brief.

Amongst those mischaracterizations is reference to the deposition of James Robison, IV, M.D., on which Murray claims his second amended motion to compel was based.[3] Murray claims that, "Cronfel's failure to fully respond became more apparent during the deposition of his medical expert, James Robison, IV, M.D., on February 18, 2014."[4] This statement is flatly untrue, as Dr. Robison was an expert retained by Murray.[5]

Murray further mischaracterizes and misstates the record related to his prior, March, 2014 Amended Motion to Compel, the trial court's order thereon, and Cronfel's response thereto (which, again, is not even the trial court order complained of herein).[6] Murray states that on March 7, 2014, "Cronfel finally provided Murray with a limited medical authorization in violation of the trial court's order."[7] However, what *actually* happened is that Murray complained of needing Cronfel's medical records regarding his "right hand, wrist and arm" dating back to at least

---

[3] *See*, Brief of Appellee at p. 7 (citing CR 248-250).
[4] *Id.*
[5] In fact, the same medical expert who Murray declined to present as a witness at trial.
[6] *See*, Brief of Appellee at pp. 7-8.
[7] *See*, Brief of Appellee at p. 8.

2005.[8] The trial court then entered an order requiring Cronfel to, "…provide a fully executed, Authorization to Disclose Protected Health Information by 3/6/14…" for; Dr. Walters, Healthsouth Hand Clinic, and Select Physical Therapy.[9] On March 7, 2014, admittedly one day late, but contrary to Murray's assertions, Cronfel provided fully executed Authorizations directed at Select Physical Therapy/Healthsouth and Robert Walters, M.D., for, "all medical and physical therapy records and diagnostic studies pertaining to patient's right arm, hand, and wrist."[10] Murray then asserts, without reference to the record, "Critically, the medical records sought included those of Lown – Cronfel's testifying medical expert," when neither his amended motion to compel, nor the March, 2014 order thereon make **any** reference whatsoever to Dr. Lown or his medical records.[11] Mere sentences later, Murray acknowledges that his motion to compel regarding Dr. Lown's medical records was filed some seven months later.[12] Rife as it is with mischaracterizations and misstatements with regard to the record, Murray's "statement of facts" regarding the discovery sanction, and the circumstances surrounding same, should be taken with a grain of salt.

2.     Cronfel's Expert, Dr. Ira Lown, and Cronfel's Medical Records.

---

[8] CR 248-251.
[9] CR 327.
[10] CR 329-330.
[11] CR 248-251 & 327.
[12] *See*, Brief of Appellee at p. 8 (citing CR 176-184).

Murray first cites approximately six pages of testimony from Dr. Lown that Cronfel had injured the same wrist at issue in this suit, "…in the same manner, in a bicycle accident four years earlier," ostensibly for the proposition that some incident other than the July, 2009 dog attack was the cause (or a cause) of Cronfel's injuries.[13] This involved Murray's trial counsel walking Dr. Lown through the medical records of the late Dr. Robert Walters, a prior hand specialist whom Cronfel had seen, related to a bicycle accident that Cronfel had in November of 2005, and essentially describing what those records said about that earlier incident.[14] However in his analysis, Murray simply ignores Dr. Lown's *own* opinion of the import (or lack thereof) of the previous accident on the injuries Cronfel now complains of. On direct examination Dr. Lown testified at length, directly and unequivocally, that with reasonable medical probability, Cronfel's 2005 accident caused neither the 'ulnar impact syndrome' that led to his ulnar shortening surgery, nor the large tear in the scapholunate ligament, which would ultimately require Cronfel to undergo a four-corner wrist fusion surgery[15]:

> Q: Looking at the Margolin & Keinarth records from the day after the attack, was there any indication that Mr. Cronfel had a lingering hand problem from any prior injury?
>
> A: No.

---

[13] *See*, Brief of Appellee at pp. 13-19 (citing IV RR 89-95).
[14] *See*, IV RR 89-95; VII RR 42-43, 54-57, 62-65 & 72-77, Plaintiff's Exh. 4.
[15] For additional, extensive testimony of Dr. Lown in this regard, see IV RR 36, 46, 52-54, 55-57 & 70.

--IV RR 36.

Q:   Is it your medical opinion that Guillermo developed this ulna impact syndrome as a direct result of the July 23rd, 2009 injury?

A:   Yes.

Q:   And is that opinion based on your education, your experience, and your real life treatment of Guillermo?

A:   Yes, it is.

Q:   And is that based on reasonable medical probability?

A:   Yes.

Q:   Regarding the injury to Guillermo's scapholunate ligament tear, do you have an opinion as to whether that injury was caused by the dog attack on July 23rd, 2009?

A:   I believe it was.

Q:   And that, again, Doctor, is based on your skills, your training, your experience, and your real-life treatment of Guillermo?

A:   That's correct.

Q:   And that, again, is based on reasonable medical probability?

A:   Yes, it is.
--IV RR 46

Q:   Okay.  If Guillermo had suffered a large scapholunate ligament tear in his right wrist two or four years before July 23rd, 2009, would you expect to see some arthritic changes in that X-ray that you're looking at?

A:   I would.

[8]

Q:   And looking at that wrist X-ray report of July 24th, 2009, was there any indication of arthritic changes due to a scapholunate ligament tear from back in 2005?

A:   No, there's not. …

Q:   From the lack of evidence of arthritic changes in Guillermo's right wrist on the July 24th, 2009 X-ray, can you tell us whether or not, in your opinion, Guillermo suffered a large scapholunate ligament tear at any time prior to July 23rd, 2009?

A:   I do not believe that he had….

*****

Q:   Is this a CT scan taken of Guillermo's right wrist from an accident he had back in 2005?

A:   Yes, it is.

Q:   And do you see where it says, quote, mild widening of the scapholunate articulation measuring about four millimeters?

A:   I do.

Q:   And what does that mean?  Can you explain that to us?

A:   Well, it could mean a couple of things.  It could just be an anatomic variant, which means that we're all born with a little bit different – the way our ligaments and bones are lined up, or it could mean that he's had a minor injury to that ligament.

Q:   Is that type of injury that you're looking at, is that a condition you've seen many patients for?

A:   Yes.

Q:   And does a mild widening to the scapholunate articulation a condition that requires surgical repair of any type, or even a wrist fusion surgery?

[9]

A:    Usually not.

Q:    Is a mild widening of the scapholunate space the type of injury that you would expect to result in degenerative arthritic changes?

A:    No.

Q:    In referring you, again, to the circled area, so we can follow along with you, a mild widening of the scapholunate space measured at approximately four millimeters – I asked you a little bit about four millimeters.  That gap between the scaphoid bone and the lunate bone, is a four-millimeter gap considered normal?

A:    Yes, it is. …

Q:    If it's a normal finding, Doctor, does that exclude the possibility that Guillermo suffered a large scapholunate ligament tear back in 2005 in November?

A:    I believe it does.
--IV RR 52-54.

Q:    Dr. Lown, would you have recommended Guillermo undergo a four-corner wrist fusion surgery if he simply had a mild disruption of the scapholunate ligament in his right wrist?

A:    No, I would not.
--IV RR 56-57.

Q     …In your professional opinion, would Guillermo need a wrist fusion surgery in his right wrist had he never been involved in this July 23rd, 2009 incident?

A:    No.
--IV RR 70.

[10]

Murray's contention in this regard, absent complete disregard of Dr. Lown's *actual* opinions as to the cause of Cronfel's injuries, is not supported by the record.[16]

Murray then identifies approximately four pages of testimony from Dr. Lown that he asserts casts doubt on Cronfel's testimony related to what Murray callously refers to as his, "purported physical pain and inability to perform routine activities."[17] It is unclear from the record what (if any) medical records Murray's trial counsel was referencing during the cited testimony, but even in this example from Murray there are at least four (4) references to physical pain and/or "hurt" that Cronfel encountered in his daily activities as a result of the injury at issue. An actual review of Cronfel's medical records admitted at trial demonstrates a medical history stretching from July 24, 2009 (contemporaneous with the incident that was the subject of the lawsuit) through September, 2014, which includes more than forty (40) doctor's visits by Cronfel related to the incident that is the subject of the underlying lawsuit, the vast majority of which reflect a near-constant pain

---

[16] Moreover Dr. Walters' medical records regarding the 2005 injury make no mention of either 'ulnar impact syndrome' or a large tear in the scapholunate ligament, referring to any issue Cronfel had at that time with the scapholunate as a "mild disruption". In fact, Dr. Walter's medical records never mentioned the possibility of 'ulnar impact syndrome' until *after* the July, 2009 dog attack. *See*, VII RR 38-77, Plaintiff's Exh. 4.

[17] *See*, Brief of Appellee at pp. 19-22 (citing IV RR 95-99).

experience on his part.[18] [19]  These include Dr. Lown's own records for more than thirty (30) visits by Cronfel that almost universally describe the treating diagnosis for Cronfel as "JOINT PAIN HAND", and which include, amongst other remarks, the following observations:

"Pain will be the last area of resolution." – Entry dated 4/24/2012.[20]

"Will the pain ever resolve?" – Entry dated 4/16/2013.[21]

"He [Cronfel] is having trouble opening doors and lifting." – Entry dated 5/28/2013.[22]

"Patient complains of not being able to turn key to start car or tie shoe." – Entry dated 12/31/2013.[23]

A number of Dr. Lown's medical records from Cronfel's check-ups/physical therapy appointments describe the constancy of Cronfel's pain similarly as occurring, "…At rest…During the day…In the morning…At night…While sleeping…With direct pressure…With motion…With twisting motion," and as exacerbated, "…By work…By driving…With activity…With lifting…With motion."[24]  Moreover,

---

[18] *See*, VII RR 18-22; 25-34; 47-48, 58 & 66-67; 80-91; and, 94-177, 194-195 & 204-205; Plaintiff's Exhs. 2, 3, 4, 5 & 6, respectively.

[19] Among these records is an entry from the records of Dr. Walters, dated July 21, 2010, which articulately described Cronfel's situation with his right wrist thusly, "CLINICAL HISTORY: Pain".  *See*, VII RR 58, Plaintiff's Exh. 4.

[20] *See*, VII RR 123, Plaintiff's Exh. 6.

[21] *See*, VII RR 161, Plaintiff's Exh. 6.

[22] *See*, VII RR 165, Plaintiff's Exh. 6.

[23] *See*, VII RR 204, Plaintiff's Exh. 6.

[24] *See*, VII RR 165, 168, 204, 207, 210 & 214, Plaintiff's Exh. 6.

regarding Cronfel's pain level and activity level, Dr. Lown testified that same were normal given his injuries and in line with his recommendations:

Q: When you discuss the problems caused by the ulna becoming longer than the radius, can you describe for us in what kinds of problems do – does that cause a patient?

A: Well, if the – if the ulna is longer, it can cause pain in the wrist from, twisting or rotating motions, extension, inflexion. Any time there's a – a transfer of force across the wrist, when you go to grab something, pick something up, squeeze something, that force goes across the wrist. And the normal anatomy of the wrist is no longer there. Typically, in a normal wrist, the ulna will take about 15 percent of the load, but when the radius is shorter than the ulna, the ulna – the ulna takes more of the load.

Q: And that's a condition that can cause pain for patients?

A: It causes pain, yeah.

Q: Do these problems associated with the ulna impact syndrome, do they occur immediately, Doctor, or do they take some time to develop?

A: They take some time.

Q: Based on your experience treating Guillermo, was he suffering from those problems, too, down by his wrist as a result of the radius fracture by the elbow?

A: Can you say that again?

Q: Sure. Based on your experience treating Guillermo, was he having problems down at his wrist joint due to that radius fracture?

A: Yes, yes.
--IV RR 41-42.

[13]

Q:   In your experience, when a patient fractures a radius bone like Guillermo did, can it be painful to engage in just very mundane everyday activities, like shaking hands?

A:   It can.

Q:   And if it gets worse, then – as opposed to saying, you know, lifting a heavy bag of groceries hurt at the beginning of this injury, but now it's gotten worse and now it hurts to shake hands. Have you seen patients experience that kind of development?

A:   Yes, I have.
--IV RR 44.


Q:   Is there any medical evidence in this case that you've seen that would suggest that Guillermo needs a wrist fusion surgery because of his exercise routine?

A:   No.
--IV RR 71-72.[25]

Murray further goes on to cite the same passage of testimony for the proposition that Cronfel, "…injured himself while working out with kettle weight-bells and heavy weights (against the specific advice of his physical therapist and Lown).[26] But neither Dr. Lown's testimony, nor the notes of Dr. Lown and/or his physical therapist, indicate that either person "specifically" advised Cronfel not to work out, not to work out with kettle bells, or not to work out with heavy weights. In fact, as noted above, Cronfel modified his workout regimen in accordance with

---

[25] For additional testimony of Dr. Lown in this regard, see IV RR 41-44, 67-68 & 71-72.
[26] *See*, Brief of Appellee at p. 23 (citing IV RR 95-99).

[14]

Dr. Lown's treatment. Murray's contention that the medical records and Dr. Lown's testimony do not comport with Cronfel's testimony regarding the pain he experiences and the difficulties he encounters with everyday activities, as a result of his injuries, is not supported by the record.

Murray next suggests that Cronfel's medical records indicate that right hand and wrist pain he was suffering in March of 2013 (and beyond), was the result of a "*separate and distinct bicycle accident,* which occurred in August of 2012…"[27] Tellingly, Murray chooses to ignore a portion of his own cross-examination of Dr. Lown on this issue:

> Q:    And then he returns to your office, among other times, but he returns on August the 14th of 2012. And at that time, he reports an event where his brakes locked up and he went over the handlebars, sometime before that, correct?
>
> A:    Correct.
>
> Q:    And for that event, you performed surgery within two weeks, did you not?
>
> A:    No.
>
> Q:    You – you didn't perform surgery to the **left** wrist within two weeks of that event?
>
> A:    Sorry. On the **left** side, yes, I did.
> --IV RR 99 (emphasis added).

And again:

---

[27] *See*, Brief of Appellee at pp. 23-26 (citing IV RR 101-104).

[15]

Q: Okay. So you think he actually – he went over the handlebars again in 2012, and he exacerbated himself again?

A: It was his **left** wrist.
--IV RR 105 (emphasis added).

Further, in arriving at this contention, Murray also ignores at least seven (7) additional, dated entries in Cronfel's medical records that specifically address the August, 2012 injury to his **left** wrist and hand, the surgery on his **left** scapholunate ligament, and the subsequent rehabilitation and check-ups related to same.[28] Murray's contention that the medical records reveal that Cronfel's complaints about the problems with his right hand and wrist were the result of a separate bicycle accident is again, not supported by the record.

Also in relation to the August, 2012 accident, Murray assails Dr. Lown's testimony as "blithely" suggesting, "…the dozen or more references to Cronfel's August 2012 collision with an automobile was a mistake or the fault of his medical assistant."[29] Dr. Lown testified on cross-examination that the reference to an automobile collision was, "…a mistake on my part."[30] Further, a review of the medical records introduced at trial demonstrates not a "dozen or more references" to an August, 2012 collision with an automobile, but just the **one**, mistaken reference,

---

[28] *See*, VII RR 128, 130, 132, 134, 156, 165 & 168, Plaintiff's Exh. 6.
[29] *See*, Brief of Appellee at p. 26 (citing IV RR 105).
[30] *See*, IV RR 105.

[16]

that came from a report dated September 11, 2014.[31]  Once again, Murray ignores those parts of the record that do not fit this false narrative.  The medical records from Arise Austin Medical Hospital that were contemporaneous with the above-referenced September, 2014 surgery, contain additional medical history records from Dr. Lown, contemporaneous with the August, 2012 accident, that describe it as follows:

> "Chief Complaint – Guillermo is a 56y old Male who presents with a primary complaint of left wrist pain.  He was riding his bike on 8.5.12 and the front brake locked up and he went over the handle bars.  He was seen the next day at Dr. Windler's office who ordered an MRI and applied a removable splint…Location: Left wrist…"
> --VII RR 320 - Plaintiff's Exh. 8.

Once again, Murray's contention in this respect is not supported by the record, and his personal attack on Dr. Lown's credibility is without merit.

Murray then asserts that Dr. Windler's medical records from 2009, demonstrate that Cronfel had "normal" wrist function as of October, 2009, approximately three months after the dog attack, and that Dr. Lown's testimony confirms this.[32]  But recall Dr. Lown's testimony (referenced above) that the symptoms of pain and difficulty with performing routine tasks in a patient with the sort of injury Cronfel experienced in July, 2009, can take some time to develop.[33]

---

[31] *See*, VII RR 190-191, Plaintiff's Exh. 6.  To be fair, the same report does appear in duplicate, two other times in the record at VII RR 273-274 & 311-312, Plaintiff's Exh. 8.
[32] *See*, Brief of Appellee at pp. 26-28 (citing IV RR 107).
[33] *See*, IV RR 41-42.

In fact, Dr. Windler's records (as well as those of Cronfel's general practitioner, Dr. Margolin, who was the first to see him after the July, 2009 attack) indicate that while there was initially some swelling in the right hand/wrist, Cronfel's initial presentment was predominantly for pain in his right elbow and right shoulder.[34] Murray again ignores the record evidence that stands in contrast to his assertion, Dr. Windler's subsequent medical records that indicate the onset of the hand/wrist pain that would begin to plague Cronfel, as Dr. Lown predicted could happen with that type of injury.[35] Again, Murray's contention in this respect is not supported by the record.

Murray sums up his attack on the credibility of Dr. Lown and Cronfel's medical records by listing his points of contention; "Prior Injury"; "No Surgery"; "Subsequent Injury"; "Full Range of Motion and the Wrist Medically Declared Normal in August 2009"; and, "Sporadic and Inconsistent History of Treatment", with no additional record references, apparently relying on those references already discredited, above.[36] In sum, Murray's argument regarding the credibility of Dr. Lown and the import of the medical records is disingenuous, at best, and sheds little to no light on the fanciful argument he seems to posit that the jury could have reasonably found that an occurrence other than the dog attack caused Cronfel's

---

[34] *See*, VII RR 18-22; and, 27-29; Plaintiff's Exhs. 2 & 3, respectively.
[35] *See*, VII RR 25-26 & 30-34, Plaintiff's Exh. 3.
[36] *See*, Brief of Appellee at pp. 28-29.

injuries, given the complete lack of evidence of a causal connection between any such occurrences and Cronfel's injuries.[37]

3.     Cronfel's Testimony.

As with his attack on the credibility of Dr. Lown's Testimony, Murray's assault on the testimony of Cronfel is dependent on mischaracterizations of, and/or flat misstatements of the record. First, Murray asserts that, "Subsequent to the (sic) Dr. Lown's testimony, Cronfel testified that, contrary to what his medical records said, he never sustained a right wrist injury in 2005."[38] This is simply not what Cronfel testified to in the passage cited by Murray, and it ignores Cronfel's lengthy testimony as to the referenced injury he suffered in 2005. The passage cited by Murray reflects Cronfel's testimony that when questioned *at his deposition approximately a year earlier*, he initially stated that he had not injured his right wrist prior to the July, 2009 dog attack, but later in the deposition corrected that statement.[39] Moreover, Cronfel addressed the 2005 injury at length in his direct examination, explaining that his understanding was in conformity with that of Dr. Walters' contemporaneous medical records, chiefly that he had broken the hamate bone in his right hand and had a 'mild disruption' of the scapholunate ligament:

---

[37] Tellingly, Murray did not present any medical expert testimony at trial in support of any such theories.

[38] *See*, Brief of Appellee at pp. 29-31 (citing IV RR 174-177).

[39] *See*, IV RR 175.

[19]

Q:      And what was your understanding of your diagnosis at that time back in 2005?

A:      I understood that I broke a little – a bone here on the palm of your hand called the hook of the hamate by pressing – by trying to break my fall….

*****

Q:      Was it your understanding that your scapholunate ligament had a mild widening or a large tear back then?

A:      I understood a mild widening.[40]

Murray's assertion that Cronfel's trial testimony lacks credibility in this regard is predicated on an untrue depiction of the record, and is without merit.

Next, Murray states that Cronfel, "…also testified that he injured his right hand and wrist in a **_2007_** bicycle accident."[41]   This assertion is based on a two question-two answer passage in Cronfel's cross-examination in which Cronfel misspoke regarding his own, earlier testimony, and requires Murray to simply ignore that earlier testimony as well as the medical records related thereto.   In fact, Cronfel's earlier testimony in this regard was that he had visited Dr. Walters in early 2007 regarding an injury to a *finger* on his *left* hand, and again in late 2007/early 2008 regarding an injury to a *finger* on his right hand.[42]

---

[40] For Cronfel's extensive testimony in this regard, see IV RR 149-153.
[41] *See*, Brief of Appellee at p. 31 (citing IV RR 177-178).
[42] *See*, IV RR 153-156.

[20]

Dr. Walters' contemporaneous medical records confirm Cronfel's account of the above-referenced injuries in 2007/2008.[43] Murray's assertion that Cronfel's trial testimony lacks credibility in this regard is predicated on a misleading (at best) depiction of the record, and is without merit.

Murray then cites approximately seven pages of testimony in which Cronfel generally describes the circumstances surrounding his collision with Murray's dog.[44] And, while Murray accurately quotes certain sections from said testimony, some of his characterizations of that testimony, e.g., that Cronfel was, "…riding very fast in the middle of the road," and, "…did nothing to avoid colliding with the dog," are once again, simply not supported by the record. Even in those passages of testimony quoted by Murray, Cronfel testifies only that he; (i) was "trying to pick up speed" and going pretty fast; (ii) was riding in the roadway some "three, four feet" away from parked cars; and, (iii) "had no chance" to avoid colliding with the dog.[45] In this respect, Murray's characterizations of the record are, once again, misleading (at best), and further, fail completely to support Murray's assertion that Cronfel's testimony lacked credibility.

Finally, Murray cites a section of his own testimony as demonstrating the location in the roadway, "…where Cronfel was immediately after the *claimed*

---

[43] *See*, VII RR 40-41, 49-53 & 68-71, Plaintiff's Exh. 4.
[44] *See*, Brief of Appellee at pp. 31-37 (citing IV RR 178-185).
[45] *Id.*

[21]

collision with Magnum, the dog."[46]  This passage of Murray's brief is the **first**

appearance of a brand, new argument – the apparent implication that the collision

may not have happened at all.  This despite the fact that Cronfel's testimony on this

issue is clear, direct, unequivocal, and uncontroverted.  In fact, Murray's testimony

as to the collision was simply:

> Q:    Okay.  So it's your testimony that you didn't see Mr. Cronfel
>        biking down the street?
>
> A:    Not at all, no, sir.
> --IV RR 208.


> Q:    Now, do you have any knowledge of any facts that Mr. Cronfel
>        did anything wrong in this collision with your dog?
>
> A:    I don't know what he did because I did not see him.
>
> Q:    Okay.  So you don't have any facts to base on that –
>
> A:    I don't know.  I did not see what he was doing.
> --IV RR 217.

Frankly, it is unclear what Murray is asserting this testimony demonstrates, beyond

Cronfel's position in the roadway after Murray's dog attacked him.  Nevertheless,

Murray's testimony certainly does not demonstrate anything with respect to the

credibility of Cronfel's testimony.  In sum, Murray's argument regarding the

credibility of Cronfel's testimony at trial demonstrates **no** inconsistency, **no**

---

[46] *See*, Brief of Appellee at pp. 37-38 (emphasis added) (citing IV RR 223-224).

prevarication, and **no** equivocation in same, is not supported by a review of the entire record, and, importantly, shines a light on Murray's mischaracterizations and/or misstatements regarding same.

## II. Standard of Review

As Cronfel explained in his principal Brief, the applicable standard of review for his legal sufficiency and factual sufficiency challenges to the jury's findings in the underlying case are well-settled.

1.   Legal Sufficiency.

The Court reviews a legal sufficiency challenge to determine, "…if the record reveals: (a) the complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact." *McDonald v. Dankworth*, 212 S.W.3d 336, 340 (Tex.App.-Austin 2006, no pet.), citing *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (citing Robert W. Calvert, *"No Evidence" & "Insufficient Evidence"* Points of Error, 38 Tex. L. Rev. 361, 362-363 (1960)).   Murray (understandably) focuses his discussion of the legal sufficiency standard almost solely on the principle of deference to the trier-of-fact as it relates to the jury's consideration of the evidence presented, i.e., the credibility of the

[23]

witnesses and weight to be given their testimony.[47] However, Murray glosses over a number of standards that the reviewing court must also bear in mind when performing a legal sufficiency review.

The reviewing court cannot disregard contrary evidence demonstrating that evidence ostensibly in support of the jury's findings was taken out of context.[48] The reviewing court cannot disregard contrary evidence showing that evidence in support of a verdict is incompetent; e.g., a supposed eyewitness's testimony being shown to be "physically impossible", or a situation in which expert testimony is required and thus, lay evidence legally insufficient.[49] The reviewing court cannot disregard contrary inferences when the equal-inference rule applies, i.e., "…the evidence does not rise above a scintilla (and thus is legally insufficient) if jurors would have to guess whether a vital fact exists."[50] And, "…when the circumstantial evidence of a vital fact is meager, a reviewing court must consider not just favorable but all the circumstantial evidence, and competing inferences as well."[51] Moreover, though jurors are the sole judges of the credibility of the witnesses, "[t]he jury's decisions regarding credibility must be reasonable," and, "Jurors cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions

---

[47] *See*, Brief of Appellee at pp. 40-42.
[48] *See*, *City of Keller*, 168 S.W.3d at 812, fn. 28.
[49] *Id*., at 812, fns. 30 & 32.
[50] *Id*., at 813, fns. 40 & 41.
[51] *Id*., at 814.

[24]

and inconsistencies, and could have been readily controverted."[52]  Further, while the jury may draw inferences from the evidence presented, such inferences must be *reasonable*, "Circumstantial evidence may be used to establish any material fact, but it must transcend mere suspicion…The material fact must be reasonably inferred from the known circumstances."[53]

2.     Factual Sufficiency.

The Court reviews a factual sufficiency, or "insufficient evidence" challenge by considering, weighing and examining **all** evidence in the record, "…both supporting and against the finding, to decide whether the verdict should be set aside." *McDonald,* 212 S.W.3d at 339, citing *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); See also, *Carney v. Roberts Inv. Co.*, 837 S.W.2d 206, 208 (Tex.App.-Tyler 1992, writ denied).  A factual sufficiency challenge should be sustained, "…only if the evidence that supports the jury finding is so weak as to be clearly wrong and manifestly unjust." *McDonald,* 212 S.W.3d at 339, citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); See also, *Carney*, 837 S.W.2d at 208 ("A reversal is required if this court concludes that the verdict is so against the great weight and preponderance of evidence as to be manifestly unjust.")

---

[52] *Id*., at 819-820, fns. 89, 99 & 100.
[53] *Lozano v. Lozano*, 52 S.W.3d 141, 149 (Tex. 2001); citing *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex. 1993), and *Joske v. Irvine*, 91 Tex. 574, 44 S.W.1059, 1064 (Tex. 1898).

3.	A Jury Can't Simply Surmise or Suspect a Vital Fact.

As noted above and at length in Appellant's Principal Brief, while jurors *are* the sole judges of credibility of witnesses and the weight to give their testimony, this is not a get-out-of-jail-free-card for findings that are not supported by actual evidence and/or reasonable inferences therefrom.  However, contrary to Murray's position in this respect, jurors' ability to "resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses" relies on there *actually being* such conflicts and/or inconsistencies.[54]  Again, as demonstrated in Appellant's Principal Brief, and above in reply to Appellee's Brief, there were no *actual* conflicts and/or inconsistencies for the jury to resolve in the case *sub judice*, such that their findings in regard to those points of error brought by Appellant are not subject to meaningful review for legal and/or factual sufficiency. That is, "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal effect, is no evidence." *McDonald*, 212 S.W.3d at 339, citing *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (citing *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

---

[54] *See*, Brief of Appellee at p. 44.  Appellee's Brief failed to properly cite the quoted passage; *City of Keller*, 168 S.W.3d at 819, fn. 90, citing *Ford v. Panhandle & Santa Fe Ry. Co.*, 252 S.W.2d 561, 563 (Tex. 1952).  This is notable, as in *Ford* the Texas Supreme Court noted *conflicting* evidence at trial, which required such resolution by the jury.  Here, there were no such conflicts to resolve.

## III. The Jury's Negligence Finding as to Cronfel is Not Supported by Legally or Factually Sufficient Evidence

Murray relies on a comparison of the facts at issue in this Court's prior opinion in *McDonald*, to those at issue in the case *sub judice* in support of his contention that the jury's contributory negligence finding in the instant case was supported by legally and factually sufficient evidence.[55] However, this is a demonstrably false comparison.

*McDonald* involved a motor-vehicle accident in which Dankworth, by her own admission, rear-ended McDonald while both of their vehicles were at a stoplight. Importantly, the evidence presented at trial involved *conflicting* testimony of Dankworth, McDonald, and the driver of a third car that was in front of McDonald at the stoplight – Mazza. As this Court stated in *McDonald*:

> "The evidence is inconsistent on whether McDonald stopped suddenly in front of Dankworth. Both McDonald and Mazza testified that McDonald had been sitting stopped in traffic behind Mazza in the moments before Dankworth hit him. The sole evidence that McDonald stopped suddenly in front of Dankworth was her testimony. She testified that McDonald stopped "unexpectedly" or "suddenly," but did little to elaborate on what she meant. Dankworth did testify, however, that she heard "screeching brakes," then saw McDonald's brake lights, but was unable to avoid hitting him. The jury could have inferred from this testimony that the screeching brakes Dankworth heard were McDonald's and that McDonald, in fact, did stop suddenly or abruptly in front of her."[56]

---

[55] *See*, Brief of Appellee at p. 46-50.

[56] *See*, *McDonald*, 212 S.W.3d at 343, citing *Oakley v. C.E. Duke's Wrecker Service*, 557 S.W.2d 810, 812 (Tex.Civ.App.-Houston [1st Dist.] 1977, writ ref'd n.r.e.); *Rash v. Whisennand*, 453 S.W.2d 353, 356-357 (Tex.Civ.App.-Houston [14th Dist.] 1970, writ ref'd n.r.e.)

That is, *McDonald* had just the sort of inconsistency, or conflict, in the evidence regarding McDonald's contributory negligence that would require the jury to resolve that conflict through its reasonable inferences. Here, there is no such conflict. Here, the **only** competent testimony regarding Cronfel's actions leading up to and including the attack from Murray's dog comes from Cronfel, and that testimony is clear, direct, and free from inconsistencies and/or contradictions. In pertinent part, Cronfel's testimony was that; (i) Cronfel was revving up for a bike ride, riding pretty fast, on a straight, slightly uphill roadway that Cronfel had ridden at least hundreds of times before[57]; (ii) Cronfel was focused on what he was doing and being careful to avoid obstructions to the side of the road[58]; and, (iii) Cronfel did not see Murray or his dog standing off of the roadway.[59] Once again, Murray mischaracterizes Cronfel's testimony regarding the speed at which he was traveling, in an attempt to manufacture the speculative inference the jury would have had to draw from this meager evidence, i.e., that Cronfel was riding his bike negligently.[60]

So desperate is he to find something, anything, on which he can assert the jury's finding in this regard is supported by the record, Murray further misstates Cronfel's testimony, and even **his own**. Murray states that the jury heard his

---

[57] *See*, IV RR 123-127 & 178-181.
[58] *See*, IV RR 125-126.
[59] *See*, IV RR 123-127 & 178-181.
[60] *See*, Brief of Appellee at pp. 49-50.

[28]

testimony that Cronfel was, "…in the middle of the road and past the parked cars when the collision with Magnum took place,"[61] when this testimony was actually about what Murray witnessed *after* the attack had taken place.  In fact, Murray testified explicitly that he witnessed nothing, and knew nothing about the attack itself:

> Q:    Okay.  So it's your testimony that you didn't see Mr. Cronfel biking down the street?
>
> A:    Not at all, no, sir.
> --IV RR 208.
>
>
> Q:    Now, do you have any knowledge of any facts that Mr. Cronfel did anything wrong in this collision with your dog?
>
> A:    I don't know what he did because I did not see him.
>
> Q:    Okay.  So you don't have any facts to base on that –
>
> A:    I don't know.  I did not see what he was doing.
> --IV RR 217.

To the extent Murray asserts that the jury could have reasonably inferred *anything* about Cronfel's actions from Murray's testimony, such is clearly not the case, as his testimony demonstrates its own legal incompetency in that respect.  **Nothing** can be reasonably inferred about Cronfel's actions from Murray's testimony, much less that Cronfel was contributorily negligent for his injuries, because Murray "did not see"

---

[61] *See*, Brief of Appellee at p. 50 (citing IV RR 223-224).

[29]

anything Cronfel was doing and did not "know" anything about what Cronfel was doing.[62] Murray also repeats, *ad nauseam*, his mantra that Cronfel testified that he, "…failed to take any evasive action or attempt to avoid the collision."[63] But again, as noted above, this is demonstrably false, as Cronfel's testimony in this respect was not that he failed to take evasive action, but that he had no opportunity to take evasive action.[64] This is, apparently, Murray's attempt to address Appellant's argument that, assuming *arguendo* there was legally and factually sufficient evidence from which the jury could reasonably have found that Cronfel breached a duty for which he could have been found contributorily negligent, there is still **no** evidence that any such breach by Cronfel proximately caused his injuries. To the extent this is the case, it simply assists in demonstrating that there was **no** evidence from which the jury could have reasonably inferred that Cronfel's actions were a *proximate cause* of his injuries, as explained in Cronfel's Principal Brief.[65]

Based on the evidence presented, the jury had no evidence or no more than a scintilla of evidence demonstrating that Cronfel's conduct constituted contributory negligence that was a proximate cause of his injuries. Moreover, the evidence was

---

[62] *See*, *City of Keller*, 168 S.W.3d at 812-813.
[63] *See*, Brief of Appellee at pp. 50-51 (citing IV RR 183-185).
[64] *See,* IV RR 183-185.
[65] *See*, Appellant's Brief at pp. 34-37.

[30]

so one-sided in this respect that the jury's finding of contributory negligence was against the great weight and preponderance of the evidence.

## IV. The Evidence is Not Legally or Factually Sufficient to Support the Jury's Damage Awards

Here again, Murray relies on a false comparison to the *McDonald* case in support of his argument on Appellant's damages points of error, stating that as in *McDonald* he, "…vigorously disputed whether all of Cronfel's medical treatment and expenses, purported physical pain and suffering, mental anguish, and alleged impairment were caused by the accident at issue."[66] Respectfully, Murray's version of 'vigorous dispute' differs greatly from that which this Court analyzed in *McDonald*. In *McDonald*, the defendant offered her own expert medical testimony, from a cardiologist, to counter the testimony of plaintiff's medical expert, an ear, nose, and throat specialist, regarding the accuracy of a diagnosis of a carotid artery dissection.[67] Here, tellingly, Murray offered **no** contrary expert testimony of any kind, much less of a kind meant to call into question Dr. Lown's expertise, as a fellowship trained hand and wrist surgeon[68], to diagnose Cronfel's hand/wrist injury. In *McDonald*, the defendant challenged plaintiff's expert's review (or lack thereof) of the medical records of plaintiff's primary care provider. Here, Dr. Lown testified

---

[66] *See*, Brief of Appellee at p. 52.
[67] *See*, *McDonald*, 212 S.W.3d at 348.
[68] IV RR 32-34.

[31]

that he examined the medical records of not only Cronfel's primary care provider, but the medical records of two other hand specialists (Drs. Walters and Vagner) and an orthopedic surgeon (Dr. Windler), including records as far back as four (4) years prior to the attack and injury in question.[69] In *McDonald*, plaintiff's expert testified that he "didn't know exactly what was going on" with the plaintiff, and that the carotid artery dissection was "just something on the list of what it might be."[70] Here, as noted at length above, Dr. Lown testified that Cronfel's injuries, and the surgeries that they necessitated and would eventually necessitate, arose solely from the dog attack at issue:

> Q: I just want to make clear. And after answering Mr. Payne's questions, have your opinions changed at all as Mr. Cronfel's treating physician that, other than this July 23rd, 2009 injury, would Mr. Cronfel need this ulnar shortening surgery or would he need the wrist fusion?
>
> A: No, he would not.
>
> Q: And that's based on your skills, experience, training, and reasonable medical probability?
>
> A: That's correct.
> --IV RR 117-118.

---

[69] IV RR 35-36, 53-56, 58-61 & 64-65.
[70] *See*, *McDonald*, 212 S.W.3d at 348.

Further, many of the pieces of "evidence" that Murray cites in support of his position regarding inconsistencies in the medical/damages testimony, are unaccompanied by **any** record references.[71]

So, in the face of conclusive expert medical testimony from Dr. Lown, and with no contrary expert medical testimony of his own, Murray asserts that the jury could have reasonably inferred that the damages Cronfel complained of as a result of the July, 2009 dog attack, were actually caused by an incident that occurred four years earlier. This assertion is supported by no evidence at all. "The general rule has long been that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Guevara v. Ferrer*, 247 S.W.3d 662, 665 (Tex. 2007), citing *Ins. Co. of N. Am. v. Myers*, 411 S.W.2d 710, 713 (Tex. 1966); see also, *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 162 (Tex. 2015). The only expert medical testimony presented came from Dr. Lown, and despite Murray's attempts at mischaracterization of same, was clear, direct, unequivocal, and based on reasonable medical probability. The medical records (both Dr. Lown's medical records, and Dr. Walters' medical records regarding Cronfel's 2005 injury as well as his 2009 injury, see pp. 6-8, above) support Dr. Lown's testimony.

---

[71] *See*, Brief of Appellee at pp. 28-29 & 54-55.

In sum, Murray's argument with respect to the jury's damages findings is that because they heard evidence that Cronfel had injured his right hand some four years earlier, they could reasonably have inferred that the injuries he was complaining of presently arose from the prior injury as opposed to the instant dog attack, despite the fact that the jury heard **no** evidence establishing a causal connection between the prior injury and the present complaints. This position is without support in the record or in the legal authorities cited. As such, the jury's damages findings were not supported by legally or factually sufficient evidence, as complained of in Appellant's Principal Brief.

## V. The Trial Court's Discovery Sanction Was an Abuse of Discretion

As noted at the outset, and tellingly, Murray fails to address the legal contentions set forth in Appellant's Brief in this regard, and mischaracterizes Cronfel's position as that he should not have been sanctioned because, "…$5,000.00 was excessive and not explained to Cronfel's satisfaction."[72] In point of fact, and as described at length in Appellant's Principal Brief, the sanction complained of was an abuse of discretion because same did not comport with the requirements of Tex. R. Civ. P. 215 in that no evidentiary hearing was held regarding the issuance of said sanctions, and the sanctions included an award related to "objectionable conduct",

---

[72] *See*, Brief of Appellee at pp. 63-64.

not authorized by Rule 215.[73]  The analysis on this issue is as simple as that, and Murray's failure to address same points to the fatal flaws inherent in the trial court's sanction order.

## Conclusion

In Appellee's Brief, Murray doubles-down on the admonition from his trial attorney to the jury to engage in rank speculation[74], not only as to the contributory negligence of Cronfel and its status as a proximate cause of his injuries arising from the July, 2009 dog attack, but also to the medical causation of Cronfel's injuries as arising from a 2005 bicycle accident, as opposed to the July, 2009 dog attack. Disregarding the dearth of evidence or any reasonable inferences therefrom that would support those findings, Murray essentially argues that the jury was entitled to reasonably infer backwards, from the occurrence of the accident itself, that the facts should then be read to support the conclusion.  This is simply not how reasonable inferences drawn from *actual* evidence works.  A review of all the evidence adduced below or only that evidence that would arguably tend to support the jury's findings, even in the light most favorable to Murray, yields the firm conclusion that reasonable minds could not differ as to the negligence that was the cause of the July, 2009 incident, or as to the cause of Cronfel's injuries arising therefrom.  Upon this record,

---

[73] *See*, Appellant's Brief at pp. 62-66.
[74] V RR 26.

[35]

the decision below must be reversed and remanded, affording Cronfel a new trial on this matter.

Respectfully submitted,

/s/ Paul T. Morin
Mr. Paul T. Morin
Texas Bar No. 14460550
Paul T. Morin, P.C.
503 West 14th Street
Austin, Texas 78701
Telephone: (512) 499-8200
Facsimile: (512) 499-8203
pmorin@austin.rr.com

Guillermo Ochoa-Cronfel
Texas Bar No. 15175600
The Cronfel Firm
2700 Bee Caves Road, Suite 103
Austin, Texas 78746
Telephone: (512) 347-9600
Facsimile: (512) 347-9911
Guillermo@thecronfelfirm.com

**Counsel for Appellant,
Guillermo Ochoa-Cronfel**

## Certificate of Compliance

I certify that on December 3, 2015, this Appellant's Reply Brief was produced on a computer and contains 7,492 words, excluding the caption, table of contents, index of authorities, signature, certificate of compliance and certificate of service, and thus does not exceed the 7,500 word limit provided for by Tex. R. App. P. 9.4(i).

/s/ Paul T. Morin
Paul T. Morin

## Certificate of Filing and Service

I certify that on December 3, 2015, I used the Court's electronic case filing system to file this Appellant's Brief and to serve this document on the counsel for Appellee:

Mr. Gregory R. Ave
Texas Bar No. 01448900
Mr. Jay R. Harris
Texas Bar No. 00793907
Walters, Balido & Crain, L.L.P.
10440 North Central Expressway
Meadow Park Tower, Suite 1500
Dallas, Texas 75231
Telephone: (214) 347-8310
Facsimile: (214) 347-8311
Greg.Ave@wbclawfirm.com
Jay.Harris@wbclawfirm.com

/s/ Paul T. Morin
Paul T. Morin

[37]