# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-18-00776-CV

---

**Mary Elo, Appellant**

**v.**

**Shawn Hurwitz, Deceased, Through the Representative of his Estate,
Deborah M. Hurwitz, Appellee**

---

### FROM THE 353RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-17-006001, THE HONORABLE DUSTIN M. HOWELL, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

This appeal arises from a jury verdict in a lawsuit brought by appellant Mary Elo against the estate of Shawn Hurwitz following a serious boating accident in 2015. In four issues, Elo argues that the trial court erred in submitting comparative fault questions related to Elo and another individual, in entering judgment on two categories of damages for which the jury awarded nothing, and in entering judgment on two other damages awards that she contends are "grossly inadequate." We will affirm the trial court's judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

In 2015, Elo joined a group of friends on a boat owned and driven by Hurwitz. The group set out on the boat at almost 3:00 a.m., and after some time on the water, decided to return to shore. On the return trip, the boat struck a barge that had been moored near the shore

while a dock was being built. Hurwitz and another passenger were killed in the accident, while Elo and the other two passengers were injured. Elo was eventually diagnosed with a traumatic brain injury, post-concussive syndrome, and post-traumatic stress disorder. She also required surgery on her right arm and hand and physical therapy.

Elo sued Hurwitz's estate and several other parties, including TxPile, the company responsible for the dock construction and for maintenance of the barge, and Rusty Signor, TxPile's president. She asserted that TxPile and Signor had failed to light the barge and dock, maintain a safe construction zone, place the dock and barge in a safe location, and provide sufficient warnings about the construction site and barge. Elo eventually settled with TxPile, Signor, and the other non-Hurwitz defendants for a total of $700,000, and in October 2017, the trial court signed an Agreed Order of Dismissal with Prejudice as to those claims.

Elo's claims against Hurwitz proceeded to a seven-day jury trial in August 2018. On the day the parties began to present evidence, Elo asked for leave to file a fourth amended petition. She asserted that "nothing has changed in the petition, as far as our allegations go," and that she was only "taking out superfluous information." Hurwitz objected, arguing it was untimely and would prejudice the defense. Hurwitz noted that the fourth amended petition omitted Elo's earlier allegations about the settling defendants' involvement in causing the accident and argued that Elo was attempting to shift the entire blame for the accident to Hurwitz after having argued that responsibility was shared by the settling defendants. The trial court allowed Elo to amend her petition "subject to [Hurwitz's] ability to refer to previous pleadings."

The parties presented evidence related to the accident, Elo's injuries, Hurwitz's behavior and intoxication, the construction of the dock, and the placement and lighting of the barge. Elo testified that the night of the accident, she met up with Hurwitz, John Deutser, Peter

2

Shaper, and several others at a bar at about 11:00 p.m. Hurwitz and the others had driven to Austin from Dallas after attending the Texas-Oklahoma football game. The group had a round of drinks, drove to a second bar for another round, and then drove to a third bar, arriving after closing time. At the third bar, the group ran into Jennifer Walley, who joined them.

Elo, Hurwitz, Shaper, Deutser, and Walley decided to go to the Austin Country Club to go out on Hurwitz's boat. After some time out on the water, Elo and Walley got cold, so Hurwitz turned the boat around. On their way back, the boat struck the construction barge, injuring Elo, Shaper, and Deutser and killing Hurwitz and Walley. Hurwitz was determined to have had a .27% blood alcohol level at the time of the accident. Elo said that if she had known that Hurwitz's blood alcohol level was three times the legal limit, she would not have gotten on the boat. However, she testified, she had never met Hurwitz before that night and did not see any signs of intoxication—"I didn't have a gauge of knowing if he was drunk or if he wasn't. He wasn't slurring his words. I didn't have a gauge to compare it to."

Deutser testified similarly, explaining that he and some friends met up with Hurwitz after the football game in Dallas and decided to drive to Austin together. Deutser said that there was alcohol in the vehicle, that he and others were drinking during the drive but that he did not drink heavily, and that he did not notice how much the others were drinking. Deutser testified that when the group got on the boat at about 3:00 a.m., he and Hurwitz carried on board the cooler of alcoholic beverages that had been in the vehicle. Deutser said that as they left the dock, Hurwitz drove slowly, "close to no-wake speed," but that he drove faster on the return because "the girls said, 'Let's go fast. I'm really cold. Let's go.'" Deutser testified that he was not heavily intoxicated, that he did not see anything to raise concerns about Hurwitz's ability to operate the boat, and that he did not see Hurwitz drinking heavily while on the water.

3

Rusty Signor testified via deposition that he is the president of TxPile, which was working on the dock project involved in the accident. He testified that he "went by the barge" several days before the accident specifically to "look for lights" and that one of his senior superintendents told him "that he had just bought the lights and they were all up." That inspection, however, occurred during daylight hours, and Signor could not see that the lights were lit. Signor testified that the barge should have had "a flashing barricade light on each of the outer pilings and each of the outer corners," as well as a "constant burn light on each of the corners of the barge." He agreed that if the barge was not properly lit, it would pose "a danger to people who were using . . . watercraft on Lake Austin," regardless of whether they were sober or intoxicated. Signor went by the barge several hours after the accident and agreed that "there wasn't a light on the front right corner. The TxDOT blinking barricade light, it wasn't there." He was shown a photo taken about a week before the accident and agreed that the photo showed "the absence of a two-way barricade light on the port corner that is protruding out into the lake." Although Signor conceded that the Texas Parks and Wildlife Department had investigated and determined that TxPile's barge "was not properly lighted at the time of the accident," he asserted that the Department's conclusion was incorrect and that he believed that the Department's director was one of Hurwitz's friends and therefore "exerted influence to have his officers intentionally fabricate legal conclusions and evidence."

A neighbor who lived near the construction site testified that he and his wife had noticed the barge "protruding out from the . . . shoreline" and "were surprised at how far it stuck out, number one, and it was very large, and then it was not well lit." He testified, "That particular location where it's located is a very dark side of the lake and we don't—there was no lighting that—that we remember." He further said that "it was a big solid piece of metal, and

4

it—it was tall and it was just a very large obstacle in the water that was not normally there, and so we thought it was very dangerous." Another neighbor testified that he saw one light on the edge of the barge closest to his house and that he was not surprised when the accident occurred because "it's in a very dark place, it's on that curve. . . . It's on the dark side of the lake versus our side where there [are] at least some lights."

At the conclusion of the parties' evidence, the trial court held a charge conference. Elo asked that the negligence questions be limited to Hurwitz and TxPile and objected to any question asking about her or Signor's negligence. The trial court overruled her objection, and the jury was asked to apportion negligence among Hurwitz, TxPile, Signor, and Elo. The jury assigned percentages of responsibility as follows: Hurwitz 47%, TxPile 23%, Signor 24%, and Elo 6%. The jury awarded Elo damages as follows: past medical expenses $85,000; future medical expenses $100,000; past physical pain and mental anguish $10,000; future physical pain and mental anguish $0; past disfigurement $0; future disfigurement $0; past physical impairment $5,000; future physical impairment $0; past loss of earning capacity $75,000; and future loss of earning capacity $150,000. Hurwitz sought judgment on the verdict, and Elo argued that the damages awards were contrary to the evidence and that she "was entitled to $1,497,214 in hard damages," rather than the $425,000 awarded by the jury. The trial court entered a final judgment consistent with the verdict and, after taking into account the $700,000 Elo received from the settling defendants,[1] ordered that she should take nothing on her claims against Hurwitz. Elo filed a motion for new trial, which the trial court overruled.

---

[1] The trial court offset the jury's damages award by the amount of money Elo had received from the settling defendants, concluding that based on the jury's answers, "as well as the stipulation presented by the parties regarding [Elo's] settlement prior to trial, [Elo] is not entitled to recover any sum of money against [Hurwitz]."

5

On appeal, Elo contends that the trial court committed reversible error in including in the jury charge comparative negligence questions as to Signor and Elo. She further contends that the evidence is legally and factually insufficient to support the jury's zero-damages awards for future physical pain and mental anguish and for future physical impairment and its damages awards for past physical pain, mental anguish, and physical impairment. We first consider Elo's challenges to the jury's damages awards.

## SUFFICIENCY OF THE EVIDENCE

Elo contests the jury's zero-damages award as to future physical pain and mental anguish and future physical impairment, arguing that because the jury confirmed through its other awards that she had suffered serious, objective injuries, it was improper for the jury to then award her zero damages for those two categories. She further contends that the jury's awards of $10,000 for past physical pain and mental anguish and $5,000 for past physical impairment were against the overwhelming weight of the evidence.

Because Elo bore the burden of proof as to her damages and now challenges the factual sufficiency of the evidence supporting the jury's damages awards, we consider all of the evidence presented to the jury and will set aside the findings only if the supporting evidence is so weak or the findings are so against the great weight and preponderance of the evidence so as to be clearly wrong and unjust. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *City of Austin v. Chandler*, 428 S.W.3d 398, 407-08 (Tex. App.—Austin 2014, no pet.); *McDonald v. Dankworth*, 212 S.W.3d 336, 338-39 (Tex. App.—Austin 2006, no pet.). The supreme court has explained how this evidentiary review should be conducted:

6

> [W]hen only one category of damages is challenged on the basis that the award in that category was zero or was too low, a court should consider only whether the evidence unique to that category is so against the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. When . . . the jury's failure to find greater damages in more than one overlapping category is challenged, the court of appeals should first determine if the evidence unique to each category is factually sufficient. If it is not, the court of appeals should then consider all the overlapping evidence, together with the evidence unique to each category, to determine if the total amount awarded in the overlapping categories is factually sufficient.

> This standard of review gives due regard to a jury's choice of whether and how to categorize and compensate for specific losses or injuries that could reasonably fall into more than one category of damages. It also advances the principles that a tort victim should be fully and fairly compensated, but that a double recovery should be avoided.

*Jackson*, 116 S.W.3d at 775. In conducting our review, we must bear in mind that, as always, "[w]hen evidence conflicts, the jury's role is to evaluate the credibility of the witnesses and reconcile any inconsistencies, and as a general proposition, the jury may believe all or any part of the testimony of any witness and disregard all or any part of the testimony of any witness." *Anderson v. Durant*, 550 S.W.3d 605, 616 (Tex. 2018) (cleaned up).

Injuries for mental anguish and physical pain and suffering have been described as "amorphous, discretionary," "subjective, unliquidated, [and] nonpecuniary." *Tagle v. Galvan*, 155 S.W.3d 510, 518-19 (Tex. App.—San Antonio 2004, no pet.); *see Hospadales v. McCoy*, 513 S.W.3d 724, 741 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *Ten Hagen Excavating, Inc. v. Castro-Lopez*, 503 S.W.3d 463, 486 (Tex. App.—Dallas 2016, pet. denied); *HCRA of Tex., Inc. v. Johnston*, 178 S.W.3d 861, 871 (Tex. App.—Fort Worth 2005, no pet.). Pain and suffering injuries are "not subject to precise mathematical calculations or objective analysis," and so "the jury has wide latitude" in determining the appropriate amounts. *Tagle*, 155 S.W.3d at 518; *see Wong v. Graham*, No. 03-00-00440-CV, 2001 WL 123932, at *11 (Tex. App.—

Austin Feb. 15, 2001, no pet.) (mem. op.); *Lee v. Huntsville Livestock Servs., Inc.*, 934 S.W.2d 158, 160-61 (Tex. App.—Houston [14th Dist.] 1996, no writ). As for claims of mental anguish, the party should present "either direct evidence of the nature, duration, and severity of her mental anguish, thereby establishing a substantial interruption in her daily routine, or circumstantial evidence of a high degree of mental pain and distress that is greater in degree than mere worry, anxiety, vexation, embarrassment, or anger." *Tagle*, 155 S.W.3d at 519; *see Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). "Mental anguish can be established through testimony from the injured party explaining how she felt and how her life was disrupted." *Tagle*, 155 S.W.3d at 519.

Physical impairment similarly "encompasses the loss of the injured party's former lifestyle." *Patlyek v. Brittain*, 149 S.W.3d 781, 785 (Tex. App.—Austin 2004, pet. denied). The party must show that "the effect of his physical impairment extends beyond any impediment to his earning capacity and beyond any pain and suffering and mental anguish to the extent that it produces a separate and distinct loss that is substantial and for which he should be compensated." *Id*. at 785-86 (cleaned up); *see Tagle*, 155 S.W.3d at 519 (effect of impairment "must be substantial and extend beyond any pain, suffering, mental anguish, lost wages, or diminished earning capacity," and party must show injuries have had a "substantial effect" that are "distinct from, or extend beyond, injuries compensable as pain and suffering, loss of earning capacity, or other damage elements").

Elo asserts that the jury recognized her objective, compensable injuries through its awards for past and future medical care, past physical pain and mental anguish, past physical impairment, and past and future loss of earning capacity. She argues that because of that recognition, the jury erred in awarding her zero damages for future physical pain and mental

8

anguish and future physical impairment and made erroneously low damages awards for past physical pain, mental anguish, and physical impairment.

Elo testified that in the days after the accident, she could not move; could not roll over; was "flat on [her] back, in excruciating pain"; and needed help with basic tasks. She was depressed; suffered from vertigo, memory loss, and night terrors; had headaches and trouble breathing; and had difficulty using her right arm. Elo testified that she had been diagnosed with post-traumatic stress disorder (PTSD) and was seeing therapist Teri Schroeder for treatment. Elo testified that although she took anti-anxiety medication before the accident "due to job stress," since the accident, sirens and hospitals trigger panic and anxiety and she is "pretty fearful" and "not as strong as I was back in 2008 or 2009." She said, "I'm not the same person. The old Mary—Mary Elo died along with two other people on October 11th of 2015. I'm trying to find a new normal."

Elo returned to work in November 2015 but soon shifted to working part-time from home because of panic attacks and headaches and eventually had to stop working in May 2016. She testified that since the accident, her friends and neighbors help with her dogs. She went on a trip with friends to celebrate her 50th birthday in April 2016 and "cried throughout the entire time. Did not stop crying. I know I drove them nuts the entire trip." She also went to New York, "one of [her] favorite places," but had to stay in her hotel room "because it was sensory overload" and a "[w]asted trip." Elo testified that she has "survivor's guilt daily" and wonders why she survived when Hurwitz and Walley, both of whom had children, did not.

Elo also testified that she has had elbow and shoulder problems since the accident. She said that when she returned to work in November, she had trouble using her right arm, saying it was "extremely painful" and that she had "difficulty with [her] dexterity." In February

9

2016, she had surgery to "reattach[] the tendons that were severed to [her] elbow" and did physical therapy several times a week for "months" afterwards. Elo said that she had had tennis elbow before the accident but that the pain after the accident was different. She also had to have surgery on her right hand after she noticed in late 2015 a knot in the palm of her hand that "looked like a marble" and was "hard as a rock"; that surgery was again followed by physical therapy. She testified that she had a future medical procedure scheduled to address her headaches, a bulging disc, and bursitis in her right shoulder. Elo's medical records after the accident say, "Diagnosis: TBI [traumatic brain injury] concussion syndrome, multiple contusions, chest wall, flank, extremities."

Schroeder testified that she specializes in trauma treatment and was Elo's therapist from January 2016 until about five months before trial. Schroeder testified that Elo's complaints at the beginning of therapy included anxiety, shallow breathing, and sleep disruption, all consistent with PTSD. Elo and Schroeder discussed Elo's triggers—which included loud noise; the sensation of moving similar to being in a boat, which could include travel in a car or a plane; and driving past a lake—and how some of those arose during her birthday trip with friends. In addition, Schroeder testified, each surgery "was a pretty large trigger." Schroeder agreed that Elo also had trauma and stress related to the lawsuit, a family member's illness, and deaths in her family and that before the accident, she had been taking antianxiety medications due to stress from work and "just daily life."

Kendra Crerand, a friend of Elo's, testified that work was very important to Elo before the accident but that since the accident, Elo "looks for words . . . or she'll lose her train of thought." Crerand said that Elo is different since the accident: "I mean, there's—there's still that humor that I'm glad that she has, that she's been able to hold on to. You see a glimpse of it,

10

but, no, it's not the same." She had seen Elo have anxiety or a panic attack, something she never witnessed before the accident, and she said Elo is "a bit of a hermit" since the accident. Crerand testified about the trip she took with Elo and other friends to celebrate Elo's birthday and said that Elo seemed "fine" when the group was active but that she got upset when she heard a loud noise. However, being on the seashore "didn't seem to bother her as—as I imagine being on a lake would." Crerand said:

> The way I knew her was somebody who enjoyed her life. She liked going places. Not just traveling, she liked going outside of her home, going to have dinner. That's—when I would come to visit her, that's—you know, she kind of made it her mission to, you know, help me relax. . . . The roles are reversed. I come up here; it's my mission to try to get her out. She no longer likes to go places. It's stressful for her. There's fear. She's not comfortable. You know, we go to the same place every time. And that's okay. You know, that's her comfort zone, and I'm okay with that, you know. . . . I—the way that I knew her isn't the way she is now. And it's clear.

Dr. David Tucker, a neuropsychologist, testified that he evaluated Elo in early January 2016. Elo's CT scans from the night of the accident and shortly afterward were normal, and Dr. Tucker explained that "[t]he absence of evidence on a CT scan or MRI scan does not rule out mild traumatic brain injury. But it's certainly a fortunate sign." Dr. Tucker said Elo reported "a variety of postconcussive symptoms" that were "suggestive of" PTSD and of a "mild head injury": depression, anxiety about her ability to work, inability to stop remembering the accident, trouble with balance, vertigo and nausea, severe headaches, more difficulty using her right arm and elbow, difficulty breathing, short-term-memory gaps, trouble finding words or expressing herself, difficulty remembering names and with reading comprehension, increased irritability, tearfulness, and mood swings. Dr. Tucker testified that Elo had a preexisting history of attention deficit hyperactivity disorder (ADHD) and that "[t]hose symptoms can be very

11

similar to what we see with head injuries, but her symptoms seemed to be a little bit more severe than what we'd predict from just uncomplicated ADHD alone."

Dr. Charlotte Smith testified that she provided two "life care plans" for Elo, one in August 2016 and another in July 2017. A life care plan starts with a review of the patient's medical records, a questionnaire completed by the patient, and an estimate of the patient's life expectancy; determines any adjustments in life expectancy; calculates "the timeframe for ongoing treatment"; and determines any lifelong medical care needs. Dr. Smith said Elo was diagnosed with "a traumatic brain injury with a concussion" and "postconcussion syndrome," which "basically means that a person's function of intellectual thought processing is off. And so in this particular instance, I know that there were issues with memory, attention, and executive functioning." Dr. Smith agreed with Dr. Tucker that a CT scan might not show a mild or moderate traumatic brain injury. She also opined that Elo's tennis elbow, a soft tissue injury, was exacerbated or reinjured by the boat accident.

Elo's medical records were introduced into evidence. The report by emergency medical services that responded to the accident and transported Elo to the hospital states that Elo did not report hitting her head or losing consciousness and that she complained of tenderness on the left side of her chest, initially refused treatment, and said, "My side hurts. I don't want to go to the hospital." The EMS report states: "Diagnosis: TBI, concussion syndrome, multiple contusions—chest wall, flank, extremities." The emergency room records from the night of the accident state that Elo had a contusion on her foot; a contusion on her "lower extremity," meaning leg, knee, ankle, foot, or toes; a chest contusion; a head injury that "does not appear serious at this time."

12

About two weeks after the accident, Elo went to the emergency room again, complaining of vertigo, memory loss, "slowness of thought and poor memory," "left rib pain and pain with a breath," and "crackles in her lung" on the left side. She was at that point diagnosed with "Acute post concussive syndrome, pneumonia, left chest pain." In November 2016, Elo sought treatment again, complaining of "intermittent vertigo" and headaches. Although the parties do not appear to have discussed it, Elo's medical records also indicate that in 2016, she had surgery to address issues with her left breast that arose after, and might have been caused by, the accident. Finally, the records also show that about six weeks before the injury, she sought medical attention for "elbow pain/injury" because of an "injury 1 year ago. Was doing well until she hit it about 2 weeks ago. Pain is getting progressively worse." Those records indicate that Elo received multiple steroid injections to address her increasing pain.

The defense presented testimony from two experts who did not agree that Elo would be hampered from working in the future; did not believe the boat accident caused or even exacerbated her preexisting shoulder and elbow complaints; and did not see indications of a head injury in her medical records from the night of the accident and shortly thereafter, noting that she did not report having hit her head or lost consciousness that night and did not report any head-related symptoms until several weeks later. Elo's sister, Midge Trammel, testified that when she saw her sister at the hospital immediately after the accident, Elo was coherent and communicating well. Elo's only visible injuries were swelling and bruising near her ribs and scrapes or bruises "from like hitting something or bumping into stuff. Just a couple of bruises on her body, but that's it." Trammel did not see cuts, bruising, or abrasions on Elo's head, and Elo did not complain about having injured her head. Trammel lived with Elo for about three months after the accident and testified that during that time she did not see signs of the injuries of which

13

Elo complained at trial. She further testified that Elo continued to go out with friends and did not say she was unable to work, complain about difficulty working, or complain that she was having any difficulty socializing. Hurwitz also presented several photographs taken after the accident in which Elo appeared to be happy and engaged at various social outings, although Elo said that she was often putting on a good show and that she socialized far less than she used to.

We have reviewed the testimony, Elo's medical records, and the other evidence produced for the jury, considering whether the evidence unique to each category of damages is factually insufficient or whether, when we consider the overlapping evidence, the total damages awarded in the overlapping categories of past and future physical pain, mental anguish, and physical impairment are against the great weight and preponderance of the evidence. *See Jackson*, 116 S.W.3d at 775. Based on that review, we cannot conclude that the evidence is insufficient to support the jury's awards.

The fact that the jury awarded Elo damages for medical care and loss of earning capacity into the future does not require awards for future pain, mental anguish, or impairment. Nor does the record establish that the awards for past pain, mental anguish, and impairment were impermissibly low. Instead, those categories of subjective, amorphous damages are reserved for injuries that cannot be compensated through an award for loss of earning capacity or medical care expenses. *See, e.g.*, *Blevins v. State Farm Mut. Auto. Ins. Co.*, No. 02-17-00276-CV, 2018 WL 5993445, at *12-13 (Tex. App.—Fort Worth Nov. 15, 2018, no pet.) (mem. op.) ("In the typical personal-injury case in which a zero-damages award for pain and suffering is affirmed despite objective injuries, the jury has been afforded the opportunity to compensate the injured party through an award of medical expenses even while also concluding that the injured party never suffered pain warranting a money award"; "[t]he same is true of physical impairment," in

which case plaintiff "must prove that (1) he incurred injuries that are distinct from, or extend beyond, injuries compensable through other damage elements; and (2) these distinct injuries have had a 'substantial' effect." (cleaned up)); *Belford v. Walsh*, No. 14-09-00825-CV, 2011 WL 3447482, at *8-10 (Tex. App.—Houston [14th Dist.] Aug. 9, 2011, no pet.) (mem. op.) (affirming zero damages for future physical impairment, pain, and mental anguish because jury could have concluded that "after two surgeries, Belford's physical restrictions were no longer any greater than they were before the accident" or "that any future physical impairment is the result of a preexisting condition"; availability of alternative conclusions based on evidence "illustrates why the determination that the appellant has not and will not suffer physical impairment apart from that already compensated for is uniquely within the jury's province" (cleaned up)); *Dollison v. Hayes*, 79 S.W.3d 246, 253 (Tex. App.—Texarkana 2002, no pet.) ("The mere fact of injury does not prove *compensable* pain and suffering, nor does it demonstrate Dollison suffered *compensable* mental anguish"; jury can conclude that plaintiff should be compensated for seeking medical care related to accident and for lost wages "but that he suffered no physical or mental injury warranting a monetary award"; and "[p]hysical impairment is an element of damages that extends beyond loss of earning capacity and beyond any pain and suffering, to the extent that it produces a separate loss that is substantial or extremely disabling.").

There is no dispute that the boat accident was a serious one or that Elo suffered injuries as a result. However, "[t]he mere fact of an injury does not prove compensable pain and suffering or impairment." *Moore v. State Farm Mut. Auto. Ins. Co.*, No. 01-09-00657-CV, 2010 WL 2220878, at *3 (Tex. App.—Houston [1st Dist.] June 3, 2010, no pet.) (mem. op.); *see Dollison*, 79 S.W.3d at 253. Elo's diagnoses of traumatic brain injury, post-concussion

15

syndrome, and PTSD were based on her subjective complaints, and no objective diagnostic test revealed abnormalities that might be causing her symptoms. *See Roberts v. Ogletree*, No. 03-02-00069-CV, 2002 WL 31426249, at *3-4 (Tex. App.—Austin Oct. 31, 2002, no pet.) (mem. op.). The jury was thus required to assess Elo's testimony, the testimony of all the medical experts, and the testimony about Elo's behavior after the accident and to resolve the inconsistencies. *See id.*; *see also Jackson*, 116 S.W.3d at 774 ("jury is the sole judge of the weight and credibility of testimony").

The jury heard that Elo initially denied hitting her head or losing consciousness, gradually complained of concussion-related or PTSD symptoms, and stopped going to therapy about five months before trial and that Elo's sister had not seen indications that Elo could no longer socialize or work. Based on this record, the jury could have determined both that Elo had suffered a head injury in the accident, resulting in medical costs both past and future, such as medications for anxiety, depression, or pain management, and that the injury was not so severe as to substantially impede her lifestyle in the future. The jury also heard evidence that Elo had complained of increasing elbow and shoulder pain on her right side before the accident occurred, and an expert testified that he did not believe that Elo's elbow injuries were related to the accident. It could have concluded that only some—or even none—of her shoulder or elbow pain was related to the accident; that only some of her surgeries were necessitated by the accident; and that her accident-related injuries, if any, had been addressed.

Sufficient evidence would support any of those conclusions, and "[a]ppellate courts are reluctant to overturn jury findings of no damages for pain and suffering when the indicia of injury and damages are more subjective than objective." *Biggs v. GSC Enters., Inc.*, 8 S.W.3d 765, 769 (Tex. App.—Houston [1st Dist.] 1999, no pet.); *see also Belford*, 2011 WL

16

3447482, at \*7 ("the amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment").  The jury could have determined that its awards for future medical costs and future lost earning capacity sufficiently compensated Elo for her accident-related injuries and that she should not be further compensated through awards for future pain, anguish, and impairment.

As to the jury's awards for past physical pain, mental anguish, and physical impairment, the jury was empowered to consider all of the evidence, both for and against Elo's claims of severe PTSD and post-concussive syndrome and whether her elbow and shoulder surgeries were necessitated by the accident or related to a preexisting condition.  Based on this record, it could have concluded that Elo should be compensated for some amount of discomfort, both physical and mental, in the past, but that she had not suffered injuries so great as to necessitate larger damages awards.  We overrule Elo's challenges to the jury's damages awards for past physical pain, mental anguish, and physical impairment and to its zero awards for future physical pain, mental anguish, and physical impairment.

### COMPARATIVE NEGLIGENCE QUESTIONS

Elo also complains that the jury should not have been asked about her or Signor's negligence and that, had those questions not been asked, Hurwitz might have been determined to be more than fifty percent at fault, which would render him jointly and severally liable under section 33.013 of the civil practice and remedies code.[2]  However, because we have upheld the jury's damages awards, Elo would be barred by the one-satisfaction rule from recovering from

---

[2] Section 33.013(b) provides that a defendant is jointly and severally liable for the claimant's damages if "the percentage of responsibility attributed to the defendant with respect to a cause of action is greater than 50 percent."  Tex. Civ. Prac. & Rem. Code § 33.013.

Hurwitz, even in the event he was found more than fifty percent at fault. The one-satisfaction rule is reflected in section 33.012(b) and provides that if the claimant settles "with one or more persons," the trial court shall "reduce the amount of damages to be recovered by the claimant with respect to a cause of action by the sum of the dollar amounts of all settlements." Tex. Civ. Prac. & Rem. Code § 33.012.

As explained by the supreme court:

> Under the one-satisfaction rule, a plaintiff is entitled to only one recovery for any damages suffered because of a particular injury. The one-satisfaction rule provides that, when a claimant seeks recovery for the same injuries from multiple parties, the claimant is entitled to only one recovery on those injuries. In requiring that each claimant's jury award is reduced by any amount for which he or she settles, section 33.012 upholds this rule.

*Utts v. Short*, 81 S.W.3d 822, 831-32 (Tex. 2002) (cleaned up). The rationale for the rule is that a plaintiff should not receive a windfall by recovering an amount that covers her entire damages when she has already been compensated in full or in part by settling defendants. *Sky View at Las Palmas, LLC v. Mendez*, 555 S.W.3d 101, 107 (Tex. 2018); *Elness Swenson Graham Architects, Inc. v. RLJ II-C Austin Air, LP*, 520 S.W.3d 145, 162-63 (Tex. App.—Austin 2017, pet. denied). "The one-satisfaction rule applies both when several defendants commit the same act and when multiple defendants commit technically different acts that result in the same, single injury." *Elness Swenson Graham*, 520 S.W.3d at 163; *see Mendez*, 555 S.W.3d at 110 ("our precedent makes clear that the causes of action pled are not the proper inquiry in applying the one-satisfaction rule"). Thus, when the plaintiff has suffered one injury, even if caused by overlapping and varied theories of liability asserted against multiple defendants, she may recover only once. *Mendez*, 555 S.W.3d at 111; *Elness Swenson Graham*, 520 S.W.3d at 163.

18

The jury determined Elo's total damages to be $425,000. Before trial, she settled with several defendants for $700,000. Thus, even assuming the trial court erred in asking whether Elo and Signor had any responsibility for the accident and Elo's resulting injuries, and even if the jury had determined that Hurwitz was more than fifty percent responsible for the accident, Elo had already recovered more than the amount at which the jury fixed her damages, and thus she would be barred from recovery by the one-satisfaction rule. *See Mendez*, 555 S.W.3d at 111. Any error in asking the jury whether Elo or Signor should be considered partially responsible for the accident and Elo's resulting injuries was therefore harmless. *See El Paso Nat. Gas Co. v. Berryman*, 858 S.W.2d 362, 364 (Tex. 1993); *Union Nat. Gas Co. v. Enron Gas Mktg., Inc.*, No. 14-98-00183-CV, 2000 WL 350546, at *5 & n.12 (Tex. App.—Houston [14th Dist.] Apr. 6, 2000, no pet.) (mem. op.). We thus overrule Elo's challenges to the jury questions related to Elo's and Signor's contributory negligence.

## CONCLUSION

We have overruled Elo's challenges to the jury's damages awards. We have also determined that as a result of those awards and Elo's recovery from the settling defendants, any error in the inclusion of comparative-negligence questions as to Elo and Signor was harmless. We affirm the trial court's judgment.

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Kelly and Smith

Affirmed

Filed: April 8, 2020

19